1

2              IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF MISSOURI
3                        SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,      ) Case No. 14-03104-01-CR-S-MDH
                                   )
5              Plaintiff,          ) Springfield, Missouri
                                   ) April 5, 2016
6   v.                             )
                                   )
7   SCOTT GOODWIN-BEY,             )
                                   )
8              Defendant.          )
    _____    )

9
           TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS EVIDENCE
10              BEFORE THE HONORABLE DAVID P. RUSH
                   UNITED STATES MAGISTRATE JUDGE
11
    APPEARANCES:
12
    For the Plaintiff:          James J. Kelleher, Esq.
13                              Assistant United States Attorney
                                901 St. Louis St., Ste. 500
14                              Springfield, MO  65806
                                (417) 831-4406
15
    For the Defendant:          Shane P. Cantin, Esq.
16                              901 St. Louis St., Ste. 1600
                                Springfield, MO  65806
17                              (417) 831-6363

18  Court Audio Operator:       Mr. C. Steve Burch

19  Transcribed by:             Rapid Transcript
                                Lissa C. Whittaker
20                              1001 West 65th Street
                                Kansas City, MO  64113
21                              (816) 914-3613

22

23

24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

1    (Court in Session at 1:36 p.m.)

2         THE COURT:  Calling in *United States vs. Scott Goodwin-*

3    *Bey.*  The defendant is present in person along with this

4    attorney, Mr. Shane Cantin.  The United States is represented by

5    Assistant United States Attorney, Mr. Jim Kelleher.  This matter

6    is set this afternoon for a hearing on Defendant's Motion to

7    Suppress Evidence and -- yeah, and does indicate statements, but

8    I know in talking with both counsel back in chambers, I know

9    there may be some clarification.  But the motion that was filed

10   by the defendant was a Motion to Suppress Evidence and

11   Statements.  Mr. Cantin, are you ready to proceed?

12        MR. CANTIN:  I am, Your Honor, yes.

13        THE COURT:  And, Mr. Kelleher, are you ready to proceed?

14        MR. KELLEHER:  Yes, Your Honor.

15        THE COURT:  All right.  I'll have the Government call

16   their first witness, please.

17        MR. KELLEHER:  The Government at this time calls

18   Jennifer Sandage to the witness stand.

19        JENNIFER SANDAGE, GOVERNMENT'S WITNESS, SWORN

20                     DIRECT EXAMINATION

21   BY MR. KELLEHER:

22   Q.  Ma'am, would you please introduce yourself to the Court?

23   A.  My name is Jennifer Sandage.

24   Q.  Where are you presently employed?

25   A.  The Springfield Police Department.

1  Q.  How long have you worked there?

2  A.  Over ten years.

3  Q.  What is your current assignment?

4  A.  Patrol.

5  Q.  How long have you been on patrol?

6  A.  Ten years.  Over ten years.

7  Q.  Were you so employed on November 30th of 2014, at

8  approximately 2:51 p.m.?

9  A.  Yes, sir.

10 Q.  Do you recall what your responsibilities included on that

11 date and time?

12 A.  I'm sorry.  In general, what my duties?

13 Q.  Yes, in general.

14 A.  Answering calls for service.

15 Q.  And at approximately that time did you get a call for service

16 with regard to an incident that had taken place at 3905 West

17 Chestnut Expressway?

18 A.  Yes, sir.

19 Q.  Could you describe to the Court what was told to you during

20 the course of that dispatch?

21 A.  There were several call comments, but it boiled down to a

22 male acting erratically, possibly mentally disordered or under

23 the influence of a controlled substance that was -- and had been

24 in possession of a firearm which was taken from him by the gas

25 station clerk there.

1  Q.  Were you the only person who was involved in this call?

2  A.  No, sir.

3  Q.  How many other officers were involved to the best of your

4  recollection?

5  A.  Sgt. Laub, Officer Miller, Corporal Nuccio, and myself.

6  Q.  Did the initial dispatch include a description of the vehicle

7  that the mentally disturbed person would have been operating?

8  A.  It didn't include a description.

9  Q.  At the time --

10 A.  And a license plate, I believe.

11 Q.  And at the time you received that information, did that have

12 any particular significance to you?

13 A.  It did.

14 Q.  Could you explain?

15 A.  The vehicle and the vehicle's occupant or driver was a person

16 of interest in a homicide case.

17 Q.  And did you know the identity of that person of interest?

18 A.  I did.

19 Q.  And what was that person's name?

20 A.  Scott Goodwin-Bey.

21 Q.  Beyond his name and the fact he was a person of interest in a

22 homicide case, was there any additional information provided to

23 you with regard to Mr. Bey?

24 A.  That he was a prior convicted felon.

25 Q.  So, once you received that information you were aware, of

1  course, that possession of firearms by a convicted felon is

2  against the law, correct?

3  A.  Yes, sir.

4  Q.  Now, what was your responsibility with regard to responding

5  to this call?

6  A.  I responded to the gas station first.

7  Q.  What took place when you arrived at the gas station?

8  A.  I inquired about the whereabouts of this firearm that had

9  been taken from the male.

10  Q.  Where was it located?

11  A.  It was located behind the counter inside of a brown paper

12  sack with some jersey-style gloves wrapped around it.

13  Q.  And did the employee of the gas station explain to you how he

14  came into possession of the firearm?

15  A.  He did.

16  Q.  Could you relate to that the Court, please?

17  A.  Mr. Goodwin-Bey had been -- or the male matching his

18  description had been at the store numerous times that day acting

19  erratic saying things that were nonsensical.  He had come and

20  gone several times.  And the last time he produced a firearm,

21  which one of the clerks took it from him.  And he wanted to get

22  it back, but he left after they told him we're not giving that

23  back to you and then we're calling the police.

24  Q.  When the subject left, did the cashier indicate where he

25  proceeded to or whether he remained in the area?

1  A.  I believe that he drove by once after he had left, but I

2  think they provided the last known direction of travel in the

3  comments.

4  Q.  And were other officers made aware of the suspected location

5  of this vehicle?

6  A.  Yes, sir.

7  Q.  And other locations were actively searching for him at that

8  point, correct?

9  A.  Yes, sir.

10 Q.  Now, you included in your report the call notes, if you will,

11 I believe, the call comments?

12 A.  Yes.  From 911 dispatch.

13 Q.  Okay.  And were those comments each conveyed to you during

14 the course of this particular incident?

15 A.  They were.

16 Q.  Okay.  Once you took possession of the firearm, did you have

17 occasion to examine it?

18 A.  I -- briefly.  Just to get the serial number to run it.

19 Q.  And when you mean -- when you say "run it," what exactly do

20 you mean?

21 A.  I had provided the serial number of the firearm to our

22 dispatch who ran it through MULES and NCIC to verify if it was

23 stolen or not stolen.

24 Q.  And what was the result of that particular inquiry?

25 A.  It had come -- it was listed as stolen.

1  Q.  Would that indicate that the gun had been stolen from a

2  location at some point and reported as such to the police?

3  A.  Yes, sir.

4  Q.  Is that also against the law?

5  A.  Yes.

6  Q.  Now, once you learned that piece of information, was that

7  conveyed to other officers involved in the investigation?

8  A.  Yes.  I provided that information of the other officers that

9  were searching the area.

10 Q.  At that point what action did you take to further the

11 investigation?

12 A.  I, after running the firearm, determined that it was stolen.

13 I secured it in my patrol car and began speaking with the

14 witnesses more in depth to get their statement of what happened.

15 Q.  Okay.  And once that was complete, were you advised of the

16 ongoing investigation being conducted by the other officers?

17 A.  I'm sorry, sir.  Your specific --

18 Q.  Well, were you informed that Mr. Goodwin-Bey had been

19 stopped?

20 A.  Yes.

21 Q.  And once you discovered that he had been stopped by your

22 colleagues, what action did you take at that point?

23 A.  I asked the clerk that had taken the firearm from the male if

24 he would consent to get in my vehicle so that I could take him by

25 -- so he could identify him.

1  Q.  And before taking him to -- or bringing him to this

2  identification procedure, was he advised of certain aspects of

3  what was to take place?

4  A.  He was.  I read him the instructions off of our Show-Up ID

5  form.

6  Q.  Okay.  And did you, in fact, drive the subject to where Mr.

7  Goodwin-Bey had been stopped?

8  A.  I did.

9  Q.  What was the condition of Mr. Goodwin-Bey in terms of was he

10 handcuffed or otherwise in custody at the point where you drove

11 past?

12 A.  He was not in handcuffs.  He was sitting on the curb and he

13 was smoking a cigarette.

14 Q.  Was the cashier able to identify Mr. Bey?

15 A.  He positively identified him as the person that he took the

16 firearm from.

17 Q.  Once he made the identification, what action did you take at

18 that point?

19 A.  I asked him again if he was positive that was male and he

20 said again, yes, it was.

21 Q.  Now, towards the conclusion of your investigation was there a

22 decision made to tow Mr. Goodwin-Bey's vehicle?

23 A.  Yes, sir.

24 Q.  And did you, in fact, request the services of Premier Towing

25 to tow the vehicle to their lot?

1  A.  I did.

2  Q.  Is this standard operating procedure for the Springfield

3  Police Department?

4  A.  Sometimes it is.

5  Q.  Why in this occasion did you have the car towed?

6  A.  When I had the car towed, it was on the side of the road.

7  There was nowhere to park it that was close to -- so that we

8  couldn't tow it.  So, we decided to tow it.  But as I started my

9  inventory search of the vehicle, I found evidence.  There was

10 projectiles, shell casings, bullets inside.  At that point I also

11 believed that this could have been involved in the homicide that

12 he was the person of interest of.  So, instead of contaminating

13 that, I had it towed and then I sealed it up with evidence tape

14 so that our detectives could take a further look.

15 Q.  Did you actually seize any of the bullets or items in the

16 car --

17 A.  I did.

18 Q.  -- during the course of the inventory search?

19 A.  Yes, sir, I did.

20 Q.  What exactly did you take, if you recall?

21 A.  What did I take?

22 Q.  Yes.  What did you seize during the inventory search?

23 A.  I don't believe I seized --

24 Q.  That was the question.  Did you seize any --

25 A.  I don't believe I seized it anything.  I kept it in there for

1  CIS to look at.

2  Q.  And later on did CIS later obtain a state search warrant to

3  conduct a search of the car?

4  A.  I have no knowledge of that.

5  Q.  Would it be fair to say that was -- that essentially covers

6  the extent of your involvement in this investigation?

7  A.  Other than transporting the firearm back to headquarters

8  where our corporal processed it and photographed it and logged it

9  in, that was it.

10         MR. KELLEHER:  I don't believe I have any further

11  questions, Your Honor.  Thank you.

12         THE COURT:  All right.  Cross-examination.

13         MR. CANTIN:  Thank you, Judge.

14                         CROSS-EXAMINATION

15  BY MR. CANTIN:

16  Q.  Officer, prior to coming here today to testify in this

17  hearing, did you review your report?

18  A.  I did, sir.

19  Q.  Did you review any other documents?

20  A.  Just my report.

21  Q.  Did you review, for example, the copy of the transcript from

22  your deposition taken on January 27, 2016?

23  A.  I did.

24         MR. CANTIN:  May I approach, Judge?

25         THE COURT:  Yeah.  You may.

1    THE WITNESS:  Yes, sir.

2  BY MR. CANTIN:

3  Q.  If you'll look at Exhibit "D."

4  A.  "D" David, yes, sir.

5  Q.  Tell me if that's the transcript that you had an opportunity

6  to review.

7  A.  It is.

8  Q.  Other than that and your report, did you review any other

9  documents?

10  A.  No, sir, I did not.

11  Q.  And as you thumb through there, does that appear to be a

12  complete copy of your deposition transcript?

13  A.  It is.

14    MR. CANTIN:  I'm going to offer Exhibit "D" for today's

15  hearing, Your Honor.

16    THE COURT:  Is it Exhibit "B" as in boy?

17    THE WITNESS:  "D" David, sir.

18    MR. CANTIN:  "D" as in David.

19    THE COURT:  Thank you.  Any objection?

20    MR. KELLEHER:  No, Your Honor.  In fact, for the

21  purposes of this hearing, I had received an exhibit list from Mr.

22  Cantin detailing Exhibit "A" through "E."  I have no objection to

23  the admission of any of those exhibits.

24    THE COURT:  All right.  Defendant's Exhibit "D" as in

25  David, will be admitted without objection for the purposes of

1   this hearing only.  And I'll note, Mr. Kelleher, that you have no

2   objection to the other exhibits that are reflected on the

3   defendant's exhibit list, "A" through "E."  Thank you.

4   BY MR. CANTIN:

5   Q.  And so, Officer, if I understand correctly, on this day of

6   November 30, 2014, when you got this dispatch call to go to the

7   Star Mart on Chestnut Expressway, you already had some

8   information, as you testified, that Mr. Goodwin-Bey was a person

9   of interest in that homicide investigation.

10  A.  Yes, sir.

11  Q.  And you were aware or you received on November 17, 2014, a

12  department-wide e-mail bulletin about the fact that he was a

13  person of interest and that, at that point anyway, November 17,

14  there was no probable cause to arrest him on the homicide

15  investigation, correct?

16  A.  That's correct.

17  Q.  And you were also aware that on November 19, just the day

18  before this incident at Star Mart that we're talking about --

19  November 29 -- I'm sorry -- 2014 -- you were aware that Greene

20  County deputies had stopped Mr. Goodwin-Bey in this same vehicle

21  and contacted Springfield, correct?

22  A.  It's possible.  I don't recall specifically that.

23  Q.  Okay.  You do recall the November 17 e-mail, but you don't

24  recall whether or not you were informed of the November 29 stop?

25  A.  Yes, sir.

1  Q.  And so when you received this dispatch to go to the Star Mart

2  -- and if you brought any of your reports and you need to refer

3  to them, just let me know, okay?

4  A.  Yes, sir.

5  Q.  You received that dispatch right after the 911 call at 2:51

6  in the afternoon, correct?

7  A.  Yes, sir.

8  Q.  And that was your beat.  That was your area of town that you

9  worked in?.

10 A.  Yes, sir.

11 Q.  And so how far away approximately or how long did it take you

12 to get to the Star Mart after you received the dispatch?

13 A.  It would have been less than three minutes, around there.  It

14 wasn't very long.

15 Q.  And did I understand your testimony that when you received

16 this dispatch, you already had information that Mr. Goodwin-Bey

17 had suffered prior felony convictions?

18 A.  Yes, sir.

19 Q.  All right.  So, when you went to the Star Mart you already

20 knew that, if this was Mr. Goodwin-Bey who the call was about,

21 that he was a convicted felon?

22 A.  Yes, sir.

23 Q.  And where did you get that information, if you know?

24 A.  Corporal McPhail.

25 Q.  And on this November 30 day that the dispatch came in, you're

1  headed to the Star Mart and you get there rather quickly, do you

2  also know from radio communication that a different officer, or

3  actually two different officers are in the process of making

4  contact with and stopping the vehicle that Mr. Goodwin-Bey is

5  driving?

6  A.  Through radio traffic, yes, sir.

7  Q.  You were aware that Officer Miller and Sgt. Laub were the two

8  officers who had seen the vehicle and were going to stop it?

9  A.  Yes, sir.

10 Q.  And based on the chronology of events, had you arrived at the

11 Star Mart before Mr. Goodwin-Bey was stopped or after or do you

12 know?

13 A.  I couldn't tell you.  It would be based on the -- whatever

14 911 had recorded.

15 Q.  And so when you got to the Star Mart what was the first thing

16 you did?

17 A.  I ran the serial number on the firearm.

18 Q.  Okay.  So, you contacted somebody who was familiar with the

19 call being made?

20 A.  Yes, sir.

21 Q.  And you located the firearm?

22 A.  Yes, sir.

23 Q.  And where was it?

24 A.  Behind the counter.

25 Q.  And did you retrieve it or did they retrieve it for you?

1  A.  I went behind the counter and got it.

2  Q.  Okay.  And then when you got the -- when you observed the

3  serial number on -- and this was a handgun, correct?

4  A.  Yes, sir.

5  Q.  When you observed the serial number, then you called

6  dispatch?

7  A.  I radioed dispatch with the information, yes, sir.

8  Q.  And I have the incident report from the 911 call which is

9  Exhibit "B."  "B" as in boy.  It was admitted without objection.

10  This details the radio traffic as it relates to the 911 call?

11  A.  Yes, sir.

12  Q.  When you call dispatch with a serial number, does it go to a

13  different operator?  Does it go to the same operator?  How does

14  that work?

15  A.  There is a dispatcher that is assigned to admin, which we run

16  people, make requests that we don't need to tie up our regular

17  channel with.

18  Q.  Okay.  So, there's some dispatchers that take 911 calls and

19  dispatch officers and deal with that?

20  A.  There is, yes.  There's call takers.  There's dispatchers and

21  then there is an admin which they deal with requests to call

22  people and things of that nature.

23  Q.  So, if I were to ask you why your dispatch conversation with

24  dispatch about the serial numbers does not appear on Exhibit "B"

25  it's probably because it's a different officer, correct?

1  Different dispatch officer?

2  A.  It's possible.  I'm not sure how that works, sir.  That's a

3  different deal.

4  Q.  Okay.  And did you call from your radio that you carry with

5  you?

6  A.  Yes, sir.

7  Q.  And so approximately, you know, if the call came in at 1451

8  and it took you two or three minutes to get there and you secured

9  the gun almost immediately, approximately what time would it have

10 been that you would have called in this serial number?

11 A.  I called it in immediately.

12 Q.  I'm sorry?

13 A.  As soon as I got the firearm I ran the serial number

14 immediately.

15 Q.  And how long did it take for them to get you an answer?

16 A.  Three or four minutes.  I'm not really quite sure.

17 Q.  And so let me ask it this way.  Did you have an answer from

18 dispatch on the serial number for this handgun before or after

19 Mr. Goodwin-Bey had been stopped?

20 A.  I don't recall that, sir.  I don't know.

21 Q.  From your radio traffic, which I assume you had your radio

22 still on, right?

23 A.  Yes, sir.

24 Q.  Because you knew other officers were at least observing Mr.

25 Goodwin-Bey's vehicle, correct?

1  A.  Yes, sir.

2  Q.  All right.  From that radio traffic, do you remember if you

3  heard whether or not he had been stopped at that point?  That

4  point being when you received word that the gun had been stolen?

5  A.  It was around there.  I can't give you a specific time.

6  Q.  And when dispatch called you about your inquiry as to the

7  serial numbers, did I understand that you said you provided that

8  information to other officers?

9  A.  That the firearm was coming back stolen?

10  Q.  Yes.

11  A.  Yes, sir.

12  Q.  Which officers did you provide that to you?

13  A.  Well, if I said it over the radio everybody hears it, but

14  specifically to my supervisor, Sgt. Laub, at the time.

15  Q.  Okay.  And when you had that radio -- did you have a radio

16  conversation with him?  Did you talk to him?

17  A.  I just provided him -- as information kept coming in I was

18  updating him.

19  Q.  And so you said that after that information came in about the

20  handgun, you provided it out over the radio, and then you had a

21  conversation with one of the persons at the Star Mart about

22  possibly going by and viewing Mr. Goodwin-Bey?

23  A.  I did.

24  Q.  And how far of a distance, if you can put it in minutes or

25  miles or understandable between the Star Mart where you're at,

1  where you responded, and where Mr. Goodwin-Bey was detained?

2  A.  It's about an eighth of a mile if I had to guess.

3  Q.  Not very far?

4  A.  No.

5  Q.  And you took Mr. Tavai, is that right?

6  A.  I'm not sure how to pronounce it, but that sounds about

7  right.

8  Q.  Okay.  You took one person from the Star Mart?

9  A.  I did.

10 Q.  A male?

11 A.  I did.

12 Q.  And you drove him over.  Did you get out of your vehicle when

13 you arrived there or did you just drive by?

14 A.  I don't believe I did, sir.

15 Q.  You don't believe you did what?

16 A.  I don't believe I got out of my vehicle.

17 Q.  Did the witness get out of the vehicle to observe this person

18 or just watch -- look at him from the vehicle?

19 A.  I believe he got out.

20 Q.  Okay.  Did they have any conversation?

21 A.  No, sir.

22 Q.  And you said when you arrived where Mr. Goodwin-Bey had been

23 detained, he was sitting on the curb smoking a cigarette.

24 A.  He was not handcuffed.

25 Q.  And he was not handcuffed?

1  A.  No.

2  Q.  Why would he not be handcuffed prior to your arrival there?

3  A.  I wasn't the one with him so I can't testify to that, sir.

4  Q.  Okay.  Going back then to your information that Mr. Goodwin-

5  Bey was a prior convicted felon, you said you received that

6  information from Corporal McPhail?

7  A.  Yes, sir.

8  Q.  And did that come just from talking to him or through a

9  bulletin or an e-mail or how was that disseminated?

10 A.  I'm not quite sure how that -- I got that information.

11 Q.  And on this day you had a dashboard camera that was audio and

12 video recording, is that correct?

13 A.  I did.

14 Q.  Have you had a chance to review that before you came here

15 today?

16 A.  I have.

17 Q.  And, in fact, you saw on that dashboard video, which I have

18 as Exhibit "A" for the Court.

19        MR. CANTIN:  I'll admit that now without objection.

20        THE COURT:  And, yeah, just so the record is clear.

21 Exhibit "B," which was apparently the 911 call, that will be

22 admitted without objection.  And now Defendant's Exhibit "A" will

23 be admitted without objection.

24 BY MR. CANTIN:

25 Q.  And, in fact, on that dashboard camera, Officer, you're very

1  plainly heard at 1139 -- or 1539 or thereabouts stating that you

2  did not know that Mr. Goodwin-Bey was a convicted felon, is that

3  true?

4  A.  I haven't heard that part of it.

5  Q.  You have not heard that part of it?

6  A.  No.

7  Q.  Okay.  And so if it's on your audio recording after Mr.

8  Goodwin-Bey was arrested and you're talking about the fact that

9  you did not know that he was a convicted felon on that day prior

10  to his arrest, would that refresh your memory as to when you

11  obtained that information?

12  A.  It's possible, yes, sir.

13  Q.  Okay.  So, it's possible that you didn't know he was a

14  convicted felon until after Mr. Goodwin-Bey had already been

15  stopped, had already been detained, and had already been arrested

16  and taken away.  If that's what your dashboard camera shows and

17  your audio recording shows that would be accurate, correct?

18  A.  Sure.

19  Q.  And we know from your audio recording that you, working your

20  beat on this particular day, November 30, you were looking for a

21  reason to detain or stop or come in contact with Mr. Goodwin-Bey,

22  correct?

23  A.  No, sir.

24  Q.  Because we know from your audio recording that at 11:52 that

25  morning, a couple hours before the Star Mart call comes in, you

1  run the plate on Mr. Goodwin-Bey's white Lincoln Town Car, don't
2  you?
3  A.  It's possible.
4  Q.  And, in fact, on your audio recording you were talking about
5  just having a feeling on this particular day that something like
6  this was going to pop on this investigation, correct?
7  A.  If it's on the recording, yes, sir.
8  Q.  And so after you take the witness by where Mr. Goodwin-Bey is
9  detained, do you have any conversations with Sgt. Laub or Officer
10 Miller, or do you take the witness back to the Star Mart?
11 A.  I take the witness back to the Star Mart.
12 Q.  And then what do you do?
13 A.  I drop the witness off and come back and talk to my boss.
14 Q.  Sgt. Laub?
15 A.  Yes, sir.
16 Q.  And after Mr. Goodwin-Bey's vehicle is towed -- well, back
17 up.  Do you search it and do an inventory before it's towed?
18 A.  I begin to do that, yes, sir.
19 Q.  And that's when you observe the ammunition in the passenger's
20 side floorboard?
21 A.  Yes, sir.
22 Q.  And you photograph those items?
23 A.  I did not photograph them.  My corporal would have done that.
24 Q.  Your corporal would have done that before it was towed or
25 after it was towed?

1  A.  I don't recall what he did, sir.

2  Q.  And who was your corporal that morning?

3  A.  Nuccio.

4  Q.  And other than to look inside the passenger compartment and

5  see the ammunition, what other inventory search do you conduct on

6  the vehicle before --

7  A.  I look in the trunk.

8  Q.  Okay.  Did you find any other items and any other parts of

9  the vehicle of evidentiary value?

10  A.  Nothing that I would seize -- that I would -- at that point I

11  decided it needed to be evidence so that it could be followed up

12  on.

13  Q.  And then do you follow the vehicle to where it is ultimately

14  impounded and seal it up for a later search or do you seal it up

15  there before it's towed?

16  A.  I waited till it was there at the impound lot after following

17  it all the way there.

18  Q.  And so when you arrive at the impound lot, do you search it

19  again when it's there or do you just seal it up --

20  A.  I sealed it up.

21  Q.  -- and allow it to be searched later?  If that's what

22  happened.

23  A.  For CIS.  It would have been not -- not my follow-up.

24          MR. CANTIN:  I have no other questions right now, Your

25  Honor.

1          THE COURT:  Any redirect?

2          MR. KELLEHER:  No, Your Honor.

3    EXAMINATION BY THE COURT:

4    Q.   And I just -- I'm trying to follow.  I know Mr. Cantin, I

5    think, answered one of the questions I had, Officer.  But from

6    the time when you were at the store and you learned that the

7    defendant had been stopped, and I know you said it was an eighth

8    of a mile, but approximately how many minutes did it take for you

9    to get there once you found out?

10   A.   Less than a minute.

11   Q.   And then -- and I may have missed this or maybe this is

12   something that's going to be covered by someone else, but when

13   you went to the Star Mart had you received information about the

14   type of vehicle?  I mean, what information did you have about any

15   vehicle that might have been involved with this incident?

16   A.   The information that was given, the plate and the Lincoln --

17   a white Lincoln.  That's the information that we had.

18          THE COURT:  And, Mr. Cantin, is that reflected in your

19   exhibit on the -- I don't have that in front of me.  That's

20   why --

21          MR. CANTIN:  It is.  Exhibit "B," Your Honor.  "B" as in

22   boy.

23          THE COURT:  Okay.  All right.  Thank you.  That's all I

24   was trying to make sure that I wasn't missing something on that.

25   All right.  And do you have other exhibits you're going to

1 introduce through another witness?

2        MR. CANTIN:  I was just going to clean up and offer "B,"

3 "C," and "E," Your Honor.  "E" as in Eugene.

4        THE COURT:  And just for the record, I know I've

5 admitted "B" which was the 911 call, the radio traffic.  "A" was

6 the dashboard.  And then it looks like Exhibit "E" --

7        MR. CANTIN:  "E" is a Springfield Police Department,

8 it's called a Show-Up ID Instruction that Officer Sandage filled

9 out with the witness.

10        THE COURT:  And "C" appears to be the deposition of

11 Jason Laub?

12        MR. CANTIN:  Yes, sir.  And I think he'll testify next.

13        THE COURT:  Okay.  And then "B."  So, I'm going to

14 admit, even though it may be somewhat premature, there's no

15 objection by the United States, so "E" will be admitted, and "C."

16 Does that take care of all of them, Steve?  I think we've

17 admitted all of them, "A" through "E."

18        MR. BURCH:  Yes, sir.

19        MR. CANTIN:  Yes.

20        THE COURT:  All right.  Thank you.  All right.  May the

21 witness be excused?

22        MR. KELLEHER:  Yes, Your Honor.

23        THE COURT:  Thank you, Officer.

24        THE WITNESS:  Thank you, sir.

25                        (Off Record Talking)

1          MR. BURCH:  Could you please state your name for the

2    record and spell your last name?

3          MR. LAUB:  Yes.  My name is Jason Laub.  The last name

4    is spelled L-A-U-B.

5          MR. BURCH.  Thank you, sir.

6              JASON LAUB, GOVERNMENT'S WITNESS, SWORN

7                         DIRECT EXAMINATION

8    BY MR. KELLEHER:

9    Q.  Sir, would you please introduce yourself to the Court?

10   A.  My name is Jason Laub.

11   Q.  Where are you presently employed?

12   A.  Springfield Police Department.

13   Q.  How long have you worked there?

14   A.  Seventeen years.

15   Q.  What position do you currently hold within the police

16   department?

17   A.  I'm a lieutenant.

18   Q.  How long have you been a lieutenant?

19   A.  About a month and a half.

20   Q.  Congratulations.  Prior to becoming a lieutenant, what was

21   your rank?

22   A.  I was a sergeant.

23   Q.  How long were you a sergeant?

24   A.  A little over three years.

25   Q.  Back on November 30th of 2014, were you employed as a

1  sergeant with the Springfield Police Department?

2  A.  Yes, sir, I was.

3  Q.  And were you on duty that date?

4  A.  Yes, sir, I was.

5  Q.  Could you describe to the Court what your duties would have

6  involved in that particular date?

7  A.  I was the supervisor over an overlap squad.  It's about a

8  ten-person unit.  We work a shift from about 11 to 29 -- or 2100,

9  9 p.m.

10  Q.  And at approximately 2:51 p.m., did you have or receive a

11  call involving the Star Mart convenience store located at 3905

12  West Chestnut Expressway?

13  A.  Yes, sir, I did.

14  Q.  To the best of your recollection could you tell the Court

15  what you recall about that call?

16  A.  Yes, sir.  We received a call for service at 3905 West

17  Chestnut Expressway reference an individual in possession of a

18  handgun.  Dispatch advised that, I believe the wording was a

19  male, black, had arrived at the store in possession of a handgun.

20  Gave it to an employee.  Left the store in a white four-door

21  Lincoln, and they provided the license plate number to that

22  vehicle, sir.

23  Q.  Did the dispatch indicate the demeanor of the individual who

24  was in possession of the firearm?

25  A.  I believe the reporting party told dispatch that they acted

1  strangely or something was not right.  I can't remember the exact

2  verbiage, but.

3  Q.  And after receiving that call, what action did you take?

4  A.  It was actually myself and Officer Sandage had received the

5  call for service.  We both responded to that location.  We were

6  coming from different areas in Springfield.  We weren't riding

7  together that day.  She responded to that location.  As I was

8  responding to that location, Officer Miller, he was working the

9  day shift that day, he had overheard the call of being dispatched

10 and he noticed a white four-door Lincoln parked at the Casey's

11 General Store there in the 4100 block of West Chestnut

12 Expressway.  Based on the weapons information, Officer Miller

13 chose to stand by at that location and wait for another unit to

14 get there before he made contact with the occupant of that car.

15 I chose to respond to Officer Miller's location there at Casey's

16 while Officer Sandage went to the -- contact the reporting party

17 or the victim at the gas station.

18 Q.  Once you arrived at Officer Miller's location, were you able

19 to observe this vehicle?

20 A.  Yes, sir.  I was westbound on Chestnut Expressway.  The

21 Casey's General Store is there on the south side.  I had pulled

22 into the middle left turn lane to turn onto Orchard Crest.  As I

23 was in the middle left turn lane I could see -- clearly see the

24 front of the store, the parking lot in front of the store.  I saw

25 the -- a white four-door Lincoln there in the lot.  It was moving

as if it was getting ready to exit the lot.  I quickly turned

south onto Orchard Crest, made an immediate right into the

Casey's lot.  When I turned into the Casey's lot both vehicles

met in passing.  I looked over.  I saw the driver of the white

car exiting the lot as I turned onto the lot.  I conducted a

quick U-turn.  I noticed the license plates matched what was

provided to dispatch.  It was occupied by only one person who was

a male, black.  I pulled up behind -- directly behind the Lincoln

there at Orchard Crest and Chestnut Expressway.  I activated my

emergency lights.  I don't recall turning on my siren.  I was

hoping that the vehicle would come to a stop on Orchard Crest

prior to turning onto Chestnut Expressway because it's a heavily

driven road.  I could see the driver of the Lincoln glancing into

his rearview mirror, but I never did see the brakelights come

off.  They stayed constantly lit and there was never any cycle

through the transmission.  Normally the reverse lights will flash

so I could tell it never was removed from drive, so I didn't exit

my vehicle.  The Lincoln turns onto Chestnut Expressway to travel

eastbound.  I turn in behind it and it immediately comes to a

stop on the south side of Chestnut.

Q.  At that point what grounds did you have to conduct that stop?

A.  I had reasonable suspicion that the vehicle itself was

occupied -- involved in a disturbance of some sort at the gas

station, at the 3900 -- 3905 West Chestnut Expressway.

Q.  Specifically, what violations did you believe might have

1  possible been committed at that location?

2  A.  Based on the information I was provided by dispatch, I know

3  there was a firearm involved.  Dispatch said that the suspect had

4  gave the weapon to the employee at the gas station.  But prior to

5  getting to Casey's General Store, Officer Sandage had announced

6  over the radio that she had contacted the victim and the

7  reporting party had taken the weapon.  I think the exact words I

8  used in my report was the reporting party had taken the weapon

9  from the suspect.  So, therefore, I thought it wasn't a

10 consensual act based on the word "taken," number one.  Number

11 two, the employee had enough concern that she would call 911, the

12 emergency phone number to activate the police.  So, I felt that

13 at a minimum, I had possibly a peace disturbance at that gas

14 station.  So, I felt I had reasonable suspicion that the crime of

15 peace disturbance probably took place.

16 Q.  Did you at that point also have indications that perhaps a

17 firearms violation had been committed?

18 A.  Yes, sir.  Yes, sir.

19 Q.  Okay.  Once you stopped the vehicle what transpired next?

20 A.  Vehicle comes to a stop at Chestnut Expressway and Orchard

21 Crest or just east of.  The driver's side door immediately opens.

22 The driver exits.  The driver holds his hands up and starts --

23 begins -- begins walking back towards my car.  I open my door.  I

24 step behind my door.  I begin to carry on a conversation with the

25 driver.  He comes to the back.  I ask him to place his hands on

1  top of his head as I conduct a *Terry* frisk based on the weapons

2  information provided by dispatch.  I find no firearms.  The

3  individual is not in possession of firearms.  I don't find any

4  weapons that I recall.  I ask him to move between the cars at

5  that time to try to create distance between us and oncoming

6  traffic in the inside lane.  I identify myself.  I briefly

7  explain the reason for the stop.  Mr. Goodwin-Bey advised that he

8  was not and had not been in possession of a firearm.  I asked him

9  if he had recently been at the gas station, he said he had just

10  been driving around.  He said that he didn't know why anybody

11  would accuse him of being in possession of a firearm.  He

12  subsequently said that "I plead the Fifth."  I interpreted that

13  as he no longer wanted to answer any questions so, therefore, I

14  did not ask him any other questions.

15  Q.  Okay.  While this was taking place, were you receiving any

16  additional information from Officer Sandage from the scene?

17  A.  Shortly after Mr. Goodwin-Bey stated that he pled the Fifth,

18  I asked that he move kind over onto the curb, the grassy area to

19  get -- create a little bit further distance from him and other

20  traffic.  I believe it was Officer Miller that stood by with him.

21  I returned to my car and called Officer Sandage who was still

22  with the victim at the gas station.  During that phone call she

23  said that she had possession of the handgun that the reporting

24  party had taken from Mr. Goodwin-Bey.  She had checked the serial

25  number on it and it was coming back as stolen on the handgun.

1  Q.  So, at some point did Officer Sandage arrive where you were

2  with the victim?

3  A.  Yes, sir.  After we determined that there was a strong

4  possibility that the handgun coming back as being stolen or being

5  listed as stolen, I asked her if she would care to ask the

6  employee if they would agree to respond to our location to

7  clarify and ensure that the person I had stopped was the

8  individual that they had taken the possession -- taken possession

9  of the weapon from.  The store clerk agreed to do so.  The clerk

10  rode with Officer Sandage to the location and the car drove past

11  us, turned around and went back and returned to the store.

12  Q.  Let me stop you right there.  How long did it take for

13  Officer Sandage to arrive with the victim after the stop was

14  initiated?

15  A.  Less than five minutes.

16  Q.  After the victim drove by, were there any further

17  communications between you and Officer Sandage?

18  A.  Mr. Goodwin-Bey was identified as being the individual that

19  the clerk had taken the firearm from.

20  Q.  And what did you do at that point?

21  A.  At that point right around that area, Officer Castaneda, he

22  was also on my squad, he arrived at the scene to assist.  I

23  exited my car.  I approached Mr. Goodwin-Bey and told him that he

24  was under arrest for a weapons violation.  I asked him to stand

25  up.  He was placed into handcuffs.  To the best of my

1  recollection, Officer Sandage transported him to the jail for

2  booking.  Officer Castaneda stayed with the vehicle and had the

3  vehicle towed from the scene.  Yes.  I'm pretty confident.  I'm

4  pretty confident of that, so I don't want to -- if there's a

5  mistake there, the mistake would have been Castaneda was the one

6  that transported while Officer Sandage processed or towed the

7  vehicle but --

8  Q.  You're just not sure which one did which?

9  A.  I'm not sure which one.  I know it happened that way.  Sorry.

10         MR. KELLEHER:  I don't believe I have any further

11  questions, Your Honor.

12         THE COURT:  All right.  Thank you.  Cross-examination.

13                      CROSS-EXAMINATION

14  BY MR. CANTIN:

15  Q.  Hello, Lieutenant.

16  A.  Hello, sir.

17  Q.  So, Lieutenant, I'll read to you just a section of the 911

18  dispatch log.  Tell me if this sounds familiar to what you

19  recall.

20  A.  Yes, sir.

21  Q.  "Male, black, pulled up.  Has a gun.  Gave it to an employee.

22  Something is wrong with him.  Arrived in white four-door Lincoln,

23  license plate number SL485D."

24  A.  Yes, sir, that's correct.

25  Q.  Okay.  And so that's the information that you were operating

1  on as you were dispatched and heading in the direction of the

2  Star Mart, understanding that you then diverted and went to where

3  Officer Miller was?

4  A.  Yes, sir.

5  Q.  All right.  And so when you activated your lights, you were

6  on the parking lot of the Casey's, or had you already then gotten

7  out onto the street there by Chestnut Expressway?

8  A.  I conducted a U-turn on Casey's lot.  I pulled up -- out onto

9  Orchard Crest.  I activated my lights while we were both

10 stationary there at the stop sign.

11 Q.  Okay.  All right.  And then the white Lincoln with Mr.

12 Goodwin-Bey then goes ahead and proceeds out onto Chestnut and

13 immediately comes to a stop?

14 A.  Yes, sir.

15 Q.  So, at the time that you initiated or activated your overhead

16 flashing lights, that is the moment in time when you believed you

17 had sufficient information to conduct a stop and detention of Mr.

18 Goodwin-Bey?

19 A.  Yes, sir.

20 Q.  And so we're going to walk through this.  Just bear with me,

21 okay?  At least at that point in time, you had not seen Mr.

22 Goodwin-Bey conduct any traffic infraction?

23 A.  No, sir.

24 Q.  You had not observed any defect, mechanical defect, licensing

25 defect on his vehicle?

1   A.  No, sir.

2   Q.  He didn't leave at a high rate of speed after you had

3   activated your lights --

4   A.  No, sir.

5   Q.  -- or before.

6   A.  Correct.

7   Q.  Okay.  He pulled over, although you prefer it not be on

8   Chestnut, he pulled over reasonably quickly after you activated

9   your lights.

10  A.  That's correct.

11  Q.  All right.  At the time you initiated your lights to pull him

12  over, you had not received information that this handgun at the

13  Star Mart at least had a preliminary hit as stolen.

14  A.  That's correct.

15  Q.  You had not received any information, either from the initial

16  911 call or from Officer Sandage after she came in contact with

17  the witnesses there that this black male had displayed the

18  handgun in an angry or threatening or assaultive nature at

19  anybody.

20  A.  She did not use those words.  That's correct.

21  Q.  And the only change between the 911 dispatch and Officer

22  Sandage's contact with you is that the dispatch said that the

23  black male has a gun, gave it to an employee and Officer Sandage

24  said the employee that she contacted said he had taken it from

25  the black male?

1  A.  Yes, sir.

2  Q.  All right.  But other than that in the information provided

3  by Officer Sandage, there was no other information that related

4  to an allegation of assault or discharge of the firearm or some

5  display of the firearm in an angry manner.

6  A.  There was nothing.  It was -- something took place that would

7  have a concern enough to call 911.

8  Q.  And the concern certainly could have been that two store

9  clerks at the Star Mart were in possession of this pistol that

10 they had either taken or had been given to them from an unknown

11 black male, correct?  It could have been as simple as that.

12 A.  Yes, it could have been as simple as that.

13 Q.  Civilians out in the world probably don't get handed firearms

14 by unknown people very often.  And when they do, I suspect, and I

15 think it's reasonable to suspect, that they had called the police

16 to come and get it.

17 A.  Yes, sir.  And they also added that he was acting strangely

18 or something to that effect.

19 Q.  And so when you came in contact with Mr. Godwin-Bey there at

20 the vehicle, am I right that between your stopping his vehicle

21 and coming in contact with him, up until the point when he was

22 arrested was approximately 30 minutes or so?

23 A.  Could you repeat the question?

24 Q.  How long was he detained before he was arrested?

25 A.  Thirty minutes is pretty close.

1  Q.  Before this dispatch to the Star Mart, were you familiar with

2  either the vehicle and the plate number or with the name Scott

3  Goodwin-Bey from other investigations that were going on?

4  A.  No, sir.

5  Q.  If Officer Sandage said she was familiar with Scott Goodwin-

6  Bey as being a person of interest in a murder investigation

7  before she was dispatched to the Star Mart on this day, that's

8  not information that you remember having?

9  A.  Officer Sandage is a really sharp individual and she retains

10  that stuff, information that's put out.  At the time all that was

11  taking place, I didn't connect the two.  I was solely focused on

12  what was taking place at the specific car stop and I didn't

13  reflect on any events leading up to this particular incident.

14  So, therefore, I didn't know who I was dealing with.

15  Q.  And so again, going back to when you initiated this stop of

16  Mr. Goodwin-Bey, do you remember that before you stopped his

17  vehicle, Officer Sandage had informed you that he was a convicted

18  felon?

19  A.  That information came up, but I'm not sure exactly when in

20  the investigation.  I don't know if that was a conversation after

21  the store clerk had driven past, I'm not sure.  That information

22  came up, but I don't know when.

23  Q.  Fair to say though that that information when it came up,

24  came up after Mr. Goodwin-Bey had been stopped and detained?

25  A.  Yes, sir.

1  Q.  And in your conversations with Mr. Goodwin-Bey, was he acting

2  erratically?

3  A.  No, sir.

4  Q.  Was he talking in a way that made him seem impaired?

5  A.  No, sir.

6  Q.  Would you describe him as not making any sense during the

7  short interactions that you had with him?

8  A.  My interaction with him was really brief.  And whenever I

9  spoke with him he answered the questions that I asked.  So,

10  correct, he was not acting strange or he was coherent.

11  Q.  Okay.  And so when he got out of the vehicle, when you had

12  him exit the vehicle and then come over and take a seat there by

13  the curb as you described earlier, was he staggering?  Was he

14  stumbling?  Was he acting --

15  A.  I didn't have him exit the vehicle.  He abruptly opened the

16  door, put his hands up and began walking towards me.

17  Q.  You're right.  I'm sorry.  When he exited the vehicle and

18  started walking towards you, though, you gave him some

19  instructions, did you not?

20  A.  Yes, sir.

21  Q.  Okay.  That's for officer safety and so you could control the

22  situation?

23  A.  That's correct.

24  Q.  He appeared to understand your instructions.

25  A.  Yes, sir.

1  Q.  He walked without stumbling or staggering, correct?

2  A.  That's correct.

3  Q.  And then went and situated himself at a place where you told

4  him?

5  A.  That's correct.

6          MR. CANTIN:  No other questions, Judge.  Thank you.

7          THE COURT:  Any redirect?

8          MR. KELLEHER:  No, Your Honor.

9  EXAMINATION BY THE COURT:

10  Q.  And again, just one follow-up question, Lieutenant.  I

11  believe that the prosecutor asked a question to the effect of

12  that you believed that perhaps some firearms violations had

13  occurred.  I forget the way the question was phrased, but what,

14  if any, firearms violation did you -- I think you had indicated

15  that it was a stop, maybe, for a peace disturbance or you were

16  investigating the peace disturbance.  And then the question from

17  the attorney for the Government was about a firearms violation.

18  Can you further elaborate?

19  A.  Yes, sir.  What I was getting at, whenever the dispatch -- my

20  report, the documents, the comments that was provided to me over

21  the radio by dispatch, and typically those comments are just

22  little snippets.  Whenever I had someone call 911, they said that

23  there's a weapon involved.  If it's given, taken, the individual

24  is not acting -- is acting strangely, I was assuming -- I had a

25  whole range of violations that this could be based on the

information.  I thought it could be as simple as a peace

disturbance or it could range all the way up to maybe an unlawful

use of a weapon just because I don't know if 100 percent of the

information that happened on the scene was relayed to dispatch

which then was relayed to me.  So, it was an assumption on my

part.

Q.  What unlawful use of a weapon offense did you have or --

A.  I didn't know if the weapon may have been pointed and a

threat was made, which I guess would be an assault probably more

than unlawful use of a weapon.  Perhaps I should rephrase that

and say it ranged from maybe a simple peace disturbance to up to

a first-degree assault.  And I was incorrect in thinking unlawful

use of a weapon.

Q.  Okay.  I just was curious.  There never was a follow-up

question.  The question was, you know, did you believe there

might have been some firearms violations that may have been

committed.  I wanted to --

A.  Yeah.  I --

Q.  You had --

A.  That was complete speculation.  I know I assumed that I --

the minimum that I had was at least some kind of peace

disturbance based on a 911 call actually being -- someone feeling

the need to call the police.  And then Officer Sandage saying

prior to me getting to Casey's that the weapon had been taken

from the suspect.  So, I thought if a weapon had to be taken, it

1  wasn't -- they didn't meet there from like a Craigslist, somebody

2  wants to show a weapon, sell it there or nothing.  It didn't seem

3  like a casual meeting, so that's why I felt I had at least a

4  peace disturbance of some sort.

5  Q.  Okay.  I just was curious.

6       THE COURT:  Any other questions?  I want to give you an

7  opportunity if I opened the door for something.

8       MR. KELLEHER:  No, Your Honor.

9       THE COURT:  Okay.

10       MR. CANTIN:  No, Your Honor.

11       THE COURT:  All right.  Thank you.  May the officer --

12  lieutenant be excused?

13       MR. KELLEHER:  Yes, sir.

14       MR. CANTIN:  Yes.

15       THE COURT:  All right.  Thank you, Lieutenant.

16       MR. KELLEHER:  The Government has no further evidence,

17  Your Honor, and no further witnesses.

18       THE COURT:  All right.  Mr. Cantin?

19       MR. KELLEHER:  I would move to admit Government's

20  Exhibit #1, which is the search warrant.  It's not referenced in

21  the defendant's motion.  However, given the nature and

22  circumstances of the way this transpired, I think out of an

23  abundance of caution the Court should be at least aware of what

24  led to the seizure of the -- ultimate seizure of the items that

25  were located in Mr. Goodwin-Bey's vehicle.

1       MR. CANTIN:  I have no objection to that, Judge.

2       THE COURT:  All right.  Government's Exhibit #1 will be

3   admitted into evidence without objection for the limited purpose

4   of this hearing.  Mr. Cantin, do you have any evidence you'd like

5   to present?

6       MR. CANTIN:  Other than the exhibits already offered,

7   Your Honor, I have no additional evidence to add.

8       THE COURT:  I certainly -- and it's been my practice to

9   give the parties an opportunity to make any argument that they'd

10  like to make.  I do believe the parties have done a good job of

11  briefing the issue, but I know that things can come up in the

12  hearing that maybe weren't anticipated, so I'll give both sides

13  an opportunity to make any argument if they'd like.

14      MR. KELLEHER:  Nothing for the Government, Your Honor.

15      MR. CANTIN:  No, Your Honor.  That's fine.

16      THE COURT:  All right.  Thank you.  The Court will take

17  the matter under advisement and will render a Report and

18  Recommendation.  With that, we'll be in recess.  Thank you.

19                  (Court Adjourned at 2:28 p.m.)

20

21

22

23

24

25

**INDEX**

**WITNESSES FOR**
**THE PLAINTIFF:**     **DIRECT**     **CROSS**        **REDIRECT**   **RECROSS**

Jennifer Sandage       2              10
Jason Laub             25             32


**EXHIBITS:**          **MARKED**      **ADMITTED**

D "D"                  11              11
D "A"                  19              19
D "B", "C"             24              24
D "E"                  24              24

G#1                    40              41

1

2

3

4

5

6

7        I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
8   above-entitled matter.

9

10        /s/ Lissa C. Whittaker          April 8, 2016
          Signature of transcriber            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25