UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
                                    )
            Plaintiff,              )
                                    ) Case No.
            vs.                     ) 14-CR-3104-MDH-1
                                    )
                                    )
SCOTT GOODWIN-BEY,                  )
                                    )
            Defendant.              )



                CRIMINAL BENCH TRIAL
      BEFORE THE HONORABLE M. DOUGLAS HARPOOL
        TUESDAY, AUGUST 23, 2016; 1:43 P.M.
              SPRINGFIELD, MISSOURI




APPEARANCES:

FOR THE PLAINTIFF:          MR. JAMES J. KELLEHER
                            UNITED STATES ATTORNEY'S OFFICE
                            901 St. Louis, Ste. 500
                            Springfield, Missouri  65806


FOR THE DEFENDANT:          MR. SHANE P. CANTIN
                            CARVER, CANTIN & MYNARICH
                            901 E. St. Louis St., Ste. 1600
                            Springfield, MO  65806


COURT REPORTER:             MS. JEANNINE RANKIN, RPR, CSR
                            UNITED STATES DISTRICT COURT
                            222 N. Hammons Parkway
                            Springfield, MO  65806


    Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1                          I N D E X

 2                                                Page No.

 3   AUGUST 23, 2016

 4   OPENING STATEMENT BY MR. KELLEHER   .   .   .   .   .   5

 5                      PLAINTIFF'S EVIDENCE

 6   WITNESSES:

 7            JENNIFER BARTON
              Direct Examination by Mr. Kelleher  .  .   7
 8            Cross-Examination by Mr. Cantin  .  .  .   15

 9            JOHN TAVAI
              Direct Examination by Mr. Kelleher  .  .   21
10            Cross-Examination by Mr. Cantin  .  .  .   27

11            JASON LAUB
              Direct Examination by Mr. Kelleher  .  .   42
12
              CHRIS BARB
13            Direct Examination by Mr. Kelleher  .  .   46
              Cross-Examination by Mr. Cantin  .  .  .   52
14
              BRIAN FOX
15            Direct Examination by Mr. Kelleher  .  .   53

16            MELISSA POTTER
              Direct Examination by Mr. Kelleher  .  .   59
17
     GOVERNMENT RESTS   .   .   .   .   .   .   .   .   .   64
18
     DEFENSE MOTION   .   .   .   .   .   .   .   .   .   .   64
19
     REPORTER'S CERTIFICATE   .   .   .   .   .   .   .   .   67
20

21

22

23

24

25
```

AUGUST 23, 2016

OPENING STATEMENT BY MR. KELLEHER — 5

PLAINTIFF'S EVIDENCE

WITNESSES:

JENNIFER BARTON
Direct Examination by Mr. Kelleher — 7
Cross-Examination by Mr. Cantin — 15

JOHN TAVAI
Direct Examination by Mr. Kelleher — 21
Cross-Examination by Mr. Cantin — 27

JASON LAUB
Direct Examination by Mr. Kelleher — 42

CHRIS BARB
Direct Examination by Mr. Kelleher — 46
Cross-Examination by Mr. Cantin — 52

BRIAN FOX
Direct Examination by Mr. Kelleher — 53

MELISSA POTTER
Direct Examination by Mr. Kelleher — 59

GOVERNMENT RESTS — 64

DEFENSE MOTION — 64

REPORTER'S CERTIFICATE — 67

Case 6:14-cr-03104-MDH   Document 79   Filed 04/25/17   Page 2 of 67

```
 1                    INDEX OF EXHIBITS

 2   PLAINTIFF'S EXHIBIT:                OFFERED    ADMITTED

 3   No. 1      Firearm                    37         37

 4   No. 2      Magazine                   38         38

 5   No. 2.1    Ammunition removed from Ruger  38     38

 6   No. 3      CD of security video       10         10

 7   No. 4      CD of 911 recording        14         14

 8   No. 5      Photo of Town Car          13         13

 9   No. 6      Photo of Perfecta box      49         49

10   No. 7      Photo of ammunition        40         40

11   No. 8      Photo of ammunition        48         48

12   No. 9      Photo of box               50         50

13   No. 10     Photo of service order     51         51

14   No. 11.1   Envelope with ammunition   49         49

15   No. 11.2   Envelope with ammunition   49         50

16   No. 11.3   Envelope with ammunition   49         49

17   No. 11.4   Envelope with ammunition   50         50

18   No. 12     Empty Perfecta box         48         48

19   No. 13     Ammunition                 51         52

20   No. 14     Indictment                 62         62

21   No. 15     J&C Case No. 97-3020-02-CR-S-RGC  62  62.

22   No. 16     Documents Case No. 31397CF2468  62   62.

23   No. 17     Documents Case No. 9110003197  62    62.

24   No. 18     DOC face sheet             62         62

25
```

USA v SCOTT GOODWIN—BEY

2                  CASE NO. 14—CR—3104—MDH—1

3                    CRIMINAL BENCH TRIAL

4                      August 23, 2016

5                      *  *  *  *  *  *

6          THE COURT:  We are here on United States v. Scott

7    Goodwin—Bey for trial.  The parties have previously waived

8    jury, so this case is set for bench trial.  Who will be

9    representing the government?

10         MR. KELLEHER:  Jim Kelleher appearing on behalf of

11   the government, Your Honor.

12            THE COURT:  And defendant?

13            MR. CANTIN:  Shane Cantin for the defense, Your

14   Honor.

15            THE COURT:  And we're proceeding on the indictment;

16   is that correct?

17            MR. KELLEHER:  That's correct, Your Honor.

18            THE COURT:  All right.  Any reason why we shouldn't

19   proceed with trial at this time?

20            MR. CANTIN:  No, Your Honor.

21            MR. KELLEHER:  No, Your Honor.

22            THE COURT:  Do the parties wish to make opening

23   statements?

24            MR. KELLEHER:  I'll give a very brief opening

25   statement, Your Honor.

4

```
 1              THE COURT:  All right.

 2              MR. KELLEHER:  Your Honor, on November 30th of 2014,

 3    the defendant, Scott Goodwin-Bey, entered the Starmart here in

 4    Springfield, Missouri.  He had a conversation with the clerk

 5    who was working at the time.  The clerk found that -- his

 6    statements to be rather odd.  Mr. Goodwin-Bey left the store

 7    very briefly and returned with a Ruger 9-millimeter pistol.

 8    He placed the pistol on the counter.  The clerk quickly

 9    removed it from his possession.  The store manager who

10    witnessed this event immediately called the police.  As

11    Mr. Goodwin-Bey exited the parking lot.  She was able to get a

12    very good look at Mr. Goodwin-Bey's car and was able to

13    provide the 911 dispatcher with not only a description of the

14    car, a description of Mr. Goodwin-Bey, but also the license

15    plate number of that vehicle.

16              In short order members of the Springfield Police

17    Department located Mr. Goodwin-Bey, detained him very briefly,

18    while other members of the Springfield Police Department spoke

19    to the manager and the clerk of the store so that they could

20    understand the story.  The clerk who removed the gun from

21    Mr. Goodwin-Bey's possession was brought to the scene.  He

22    identified Mr. Goodwin-Bey as the person who brought the

23    firearm into the store.  Mr. Goodwin-Bey at that point was

24    placed under arrest.

25              During the ensuing investigation, the officers
```

5

executed a search warrant upon Mr. Goodwin-Bey's vehicle,
recovering numerous rounds of ammunition, a empty box of the
same brand of ammunition, and the ammunition recovered from
Mr. Goodwin-Bey's gun was consistent with the brand of
ammunition that was recovered from his car.

You will hear from a ATF agent trained in
determining the origin of firearms and ammunition.  He will
tell you that both the firearm and ammunition seized from
Mr. Goodwin-Bey originated outside the state of Missouri.

Finally, you will hear from Missy Potter, a
probation officer in this building, who during
Mr. Goodwin-Bey's last trip to federal court wrote his
presentence investigation report, spoke to Mr. Goodwin-Bey and
was able to cull all the supporting documentation that
established that he is, in fact, a convicted felon.

At the conclusion of trial, Your Honor, I would ask
that you find the defendant guilty as charged.

THE COURT:  Does the defendant want to make an
opening statement at this time, you want to defer or neither?

MR. CANTIN:  I'll waive opening, Your Honor.  Thank
you.

THE COURT:  All right.  Government is recognized,
then, to present its first witness.

MR. KELLEHER:  Your Honor, at this time the
government calls Jennifer Barton to the witness stand.

6

```
1            THE COURT:  All right.

2            Raise your right hand to be sworn by the clerk,

3   please.

4            THE WITNESS:  Yes, sir.

5   JENNIFER BARTON, GOVERNMENT WITNESS, SWORN:

6                      DIRECT EXAMINATION

7   BY MR. KELLEHER:

8   Q    Ma'am, would you please introduce yourself to the Court.

9   A    I'm Jennifer Barton.

10  Q    Where do you work, ma'am?

11  A    Starmart.

12  Q    Where is that Starmart located?

13  A    3905 West Chestnut Expressway, Springfield, Missouri.

14  Q    How long have you worked for Starmart?

15  A    Nine years.

16  Q    Were you working back on November 30th of 2014,

17  specifically that afternoon?

18  A    Yes, sir.

19  Q    And on that date did anything out of the ordinary take

20  place at your place of employment?

21  A    Yes, sir.

22  Q    Could you relate to the Court what brought your attention

23  to this disturbance, if you will?

24  A    I was in my office and I was watching the cameras as I

25  was working and I seen one of my employees up front, there was
```

7

1  a tall black man in front of him and they were kind of

2  scuffling and John was turning around looking at the camera,

3  so I went outside to see what was going on.

4  Q    What transpired when you went outside to the front of the

5  store?

6  A    When I went to the front of the store, I went up to the

7  register area.  There was a gun on the counter at that time.

8  And there was the tall thin man and my employee standing there

9  and he kept putting the gun into John's hand and asking John

10 if we were even, are we done, do I owe for anything, and John

11 turned around and looked at me and we were both confused.  It

12 just kind of went back and forth with the gun.  Everybody was

13 kind of handling the gun.

14 Q    Do you see that person who was at your store that day in

15 court today?

16 A    Yes.  He's right over there.

17 Q    Could you point him out and describe what he's wearing?

18 A    He's wearing a striped uniform sitting right there.

19        MR. KELLEHER:  Could you please let the record

20 reflect identification of the defendant, Your Honor?

21        THE COURT:  Will so reflect.

22 Q    (By Mr. Kelleher) Did eventually the gun come into your

23 possession?

24 A    Yes, it did.

25 Q    Could you explain how that took place?

8

```
 1   A     Like I said, the gun was kind of going from hand to hand
 2   and they were talking and the man wasn't really making any
 3   sense, so John just kind of swiped the gun out of his hand,
 4   turned around and handed it to me.
 5   Q     I'm going to show you Government's Exhibit 1 and I would
 6   ask if you can take a look at this object and ask if that
 7   looks familiar to you?
 8   A     Yes, sir, it does.  It's a Ruger.
 9   Q     What is that?
10   A     It's a gun, a Ruger.
11   Q     Where have you seen that gun before?
12   A     In that man's possession when we took it from him.
13   Q     What did you do with the gun eventually?
14   A     After I got over the initial shock, I used a jersey
15   glove, handled it.  I immediately dialed 911 and told the
16   officer on the phone that a man was there, what was going on,
17   that he had a gun, that it was now in my possession.
18   Q     Now, you indicated that you were watching your cashier on
19   a surveillance video?
20   A     Yes.
21   Q     Does your store maintain video cameras?
22   A     Yes, I have.
23   Q     Did you, in fact, have the video system operating on
24   November 30th?
25   A     Yes, sir.
```

9

```
 1   Q    And was this altercation or this event recorded using
 2   your machinery?
 3   A    Yes, sir.
 4   Q    I'll show you what's been marked as Government's
 5   Exhibit 3.  Could you identify this compact disc for me?
 6   A    Yes.  This is the video disc that we ran off at my store.
 7   Q    How do you recognize that that is, in fact, the video
 8   disc from November 30th of 2014?
 9   A    Because I watched it and my initials are on there.
10   Q    And does this video capture the extent of the interaction
11   between yourself, Mr. Goodwin-Bey and your store clerk,
12   Mr. Tavai?
13   A    Yes, sir.
14        MR. KELLEHER:  Your Honor, I move to admit
15   Government's Exhibit 3 at this time.
16        MR. CANTIN:  No objection, Your Honor.
17        THE COURT:  Government's Exhibit 3 will be admitted.
18        MR. KELLEHER:  Ask leave of Court to publish it to
19   the Court?
20        THE COURT:  You may.
21   Q    (By Mr. Kelleher) I'll hand this to you.  It's a laser
22   pointer.  This is the laser.  Do you see the little red dot?
23   A    Uh-huh.
24   Q    Now, does that video show the counter where you worked
25   at?
```

Case 6:14-cr-03104-MDH   Document 79   Filed 04/25/17   Page 10 of 67

```
 1   A    Yes, sir.

 2   Q    It may be easier if you look at that monitor.

 3   A    Okay.

 4   Q    I'm going to advance the footage just a bit.

 5        Do you see the person who came into your store in

 6   front of the counter at this point?

 7   A    Yes.  That looks like him right there.

 8   Q    The person who's wearing the T-shirt with his back to us,

 9   could you tell us who that is?

10   A    That was my employee, John.  Yeah, he's --

11   Q    Were you able to watch this as it transpired back on

12   November 30th from your office?

13   A    Yes.

14   Q    Now, at that point did he leave the store?

15   A    Yes.  He went out to his vehicle.

16   Q    And is that him again?

17   A    Yes.

18   Q    Was that firearm in his hand?

19   A    Yes.

20   Q    Now, can you identify the person who came into the frame

21   right now?

22   A    That's me.  That's when I realized he had a gun.  I

23   jumped behind John.

24   Q    Can you tell us what the object in Mr. Tavai's hand is at

25   that point?
```

```
1   A    Brown jersey with the gun in it.

2   Q    Have you now taken possession of the gun?

3   A    Yes.

4   Q    I note that the surveillance footage shows it's at 15:36,

5   which could indicate 3:36.  Is the time on that correct?

6   A    No.

7   Q    Could you explain to the Court what the problem is?

8   A    The time is off on our computer system at the store.  It

9   was off an hour.

10  Q    So the actual time would have been 2:36?

11  A    Yes.

12  Q    Now, again, I see you at the counter.  What are you doing

13  at this point?

14  A    I'm trying to decide what to do.  Watching what's going

15  on outside.  Looking at the gun.  Worried about my employee.

16  Q    Were you able to get a good look at the vehicle that the

17  defendant was --

18  A    Yes, sir.

19  Q    -- in?

20  A    Yes, sir.  It was parked right outside the door.

21  Q    Show you what's been marked as Government's Exhibit 6.

22  Ask if you would identify this photograph for me?

23  A    Yes.  That's his car that was parked out front.

24  Q    Were you able to observe the license plate of the car on

25  that day?
```

```
 1   A    Yes, I was.  I stared right at it.

 2   Q    Now, it would appear on the videotape you're now on the

 3   phone.  Who are you calling?

 4   A    The police.

 5          MR. KELLEHER:  Before I get too far ahead, Your

 6   Honor, move to admit Government's Exhibit 6.

 7          MR. CANTIN:  No objection, Your Honor.

 8          THE COURT:  On the list of exhibits I have 6 is a

 9   photograph of an ammunition box.

10          MR. KELLEHER:  I'm sorry.  Government's Exhibit 5.

11          MR. CANTIN:  No objection to 5, Your Honor.

12          THE COURT:  Five will be admitted.

13   Q    (By Mr. Kelleher) Now, you indicated that you called

14   911, correct?

15   A    Yes, sir.

16   Q    I will show you what's been marked as Government's

17   Exhibit 4.  Could you tell me what that is?

18   A    That is the recording of the 911 call.

19   Q    And have you had occasion to listen to that recording?

20   A    Yes, sir, I did, and I initialed it.

21   Q    You initialed the compact disc?

22   A    Yes, sir.

23   Q    Does that recording accurately reflect the conversation

24   you had with the 911 operator back on November 30th of 2014?

25   A    It does, yes, sir.
```

13

```
 1          MR. KELLEHER:  Your Honor, I would move to admit
 2  Government's Exhibit 4.
 3          MR. CANTIN:  No objection.
 4          THE COURT:  Government's Exhibit 4 will be admitted.
 5          MR. KELLEHER:  I'd ask to publish that.
 6          THE COURT:  You may.
 7          (Government's Exhibit No. 4 played.)
 8  Q    (By Mr. Kelleher) Now, after making that 911 call did
 9  it take very long for the police to arrive?
10  A    No, sir.
11  Q    Could you give us an idea of how long after you placed
12  the call they arrived on scene to speak with you?
13  A    Probably about a minute, minute and a half.
14  Q    What took place once the police arrived on scene?
15  A    Once the police arrived, the lady came in, she took the
16  gun from me, we discussed that he was down the road, that he
17  had been stopped, they had him in custody and just the general
18  information along with the report.
19  Q    Now, did you have occasion to make contact with the
20  Springfield Police Department the next day?
21  A    Yes, sir.
22  Q    What was that in reference to?
23  A    I told them I wasn't very good at recordings and they
24  came out and took the recording device and made copies.
25  Q    Was there anything else that was located that they didn't
```
14

1  take initially?

2  A    Yes, the bullets.  After the incident was over, I did go

3  outside and there were little silver bullets laying all over

4  the parking lot.

5  Q    I will show you what's been marked as Government's

6  Exhibit 13.  I will ask if you could take a peek in this paper

7  sack, if those look familiar to you?

8  A    Yeah.

9  Q    How do they look familiar?

10  A    There's five.  There should be five.  I picked up five

11  bullets out of the parking lot, put them in my hand, took them

12  in the store.

13  Q    Did you provide those the next day to Officer Chris Barb?

14  A    Yes, sir, I did.

15  Q    Thank you, ma'am.

16  A    Uh-huh.

17          MR. KELLEHER:  I don't believe I have any additional

18  questions, Your Honor.

19          THE COURT:  Cross-examination?

20                  CROSS-EXAMINATION

21  BY MR. CANTIN:

22  Q    Hello, Ms. Barton.

23  A    Hello.

24  Q    My name is Shane Cantin.  I don't think we've ever met,

25  have we?

1    A     No, sir.

2    Q     Okay.  I'm going to ask you a few questions here.

3          Now, when the prosecutor got started during his

4    discussion with you, he used the word disturbance and then I

5    think you used the word during a couple of your answers of

6    scuffling and an altercation.  I want to talk to you about

7    that for a second.

8          When this black male came into the store and you

9    observed this person on the camera and you went out there, I

10   want to be clear, did you see an altercation?

11   A     No.  They were just bantering back and forth.

12   Q     They were talking, correct?

13   A     Yes.

14   Q     About this gun?

15   A     About the gun, about was he even, did he owe us anything.

16   Q     Did you hear the black male raise his voice or yell or

17   threaten in any way during this conversation?

18   A     No, not honestly.

19   Q     Okay.  Did you hear Mr. Tavai, your employee, raise his

20   voice or yell or threaten in any way that you remember?

21   A     No.

22   Q     Did they physically wrestle over the gun in any way that

23   you recall?

24   A     No.  The only thing I saw was the shoving back and forth

25   of the gun.

16

```
 1   Q    Right.  And that is the black male kind of shoved the gun
 2   toward Mr. Tavai and Mr. Tavai kind of --
 3   A    Shoved it back.
 4   Q    -- shoved it back?
 5           Didn't take it right away?
 6   A    No.
 7   Q    In fact, in the 911 recording that we just heard, you
 8   told the person on the other end of the line that this black
 9   male had gave it to the employee, meaning the gun, correct?
10   A    Right.
11   Q    Okay.  So it wasn't a situation that you observed any
12   time during this event where Mr. Tavai either wrestled it away
13   from this black male or the black male wrestled it away from
14   Mr. Tavai?
15   A    No.
16   Q    On the video that we watched a part of, the black male's
17   face is obscured; you'll agree with that?
18   A    Yes, sir.
19   Q    And will you also agree that I think you testified, of
20   course, this occurred November 30th of 2014, right?
21   A    Yes, sir.
22   Q    Did you have an opportunity around that time frame,
23   either that same day or the next day or even the next week, to
24   talk to officers and look at like a photo array of different
25   individuals so that you could pick out Mr. Goodwin-Bey?
```

17

```
 1   A     I do not remember, honestly, sir.  But he had been to my
 2   store two or three times previous that weekend.
 3   Q     Had you interacted with him?
 4   A     Yes.
 5   Q     How had you interacted with Mr. Goodwin-Bey on these
 6   other occasions?
 7   A     Talking to him, trying to find out what it was he truly
 8   wanted.  He didn't make sense a lot, of what he -- he was
 9   looking for his girlfriend the first time, he said.
10   Q     That was an occasion you're describing other than this
11   one with the handgun?
12   A     Yes, sir.
13   Q     And we saw also on the video that this black male at the
14   beginning of the section that we watched was apparently using
15   the telephone.  Mr. Tavai had let him use the telephone.  Do
16   you see that?
17   A     I believe so.
18   Q     Did you know what the telephone was about?
19   A     No.
20   Q     Did you ask Mr. Tavai?
21   A     No.
22   Q     The video that we watched came from a variety of cameras
23   that appeared within the store; is that right?
24   A     Yes, sir.
25   Q     Did you have cameras outside of the store on the pumps
```

18

1    and in the parking lot as well?

2    A    No, I do not.

3    Q    Okay.

4    A    They just shoot right out the front door.

5    Q    So on November 30 of 2014, just so I'm clear, there were

6    no cameras outside the store that would have provided a view

7    of the parking lot or the area where this white car parked?

8    A    No.

9    Q    Likewise, there would not be any recordings of the

10   outside of the store where you said you found bullets the next

11   day?

12   A    No, sir.

13   Q    When in relation to this event -- because we know it was

14   on November 30th, we know it was around 2:30 in the afternoon.

15   When in relation to that did you say that you found these

16   other bullets?

17   A    The officers had already been there and I -- the car had

18   been moved, was gone, I was getting ready to go home myself

19   and I looked down and I seen a bullet.  I scattered the area

20   and I saw there was more than one bullet.  And he had been to

21   the trunk of the car with the gun.  He took it outside, went

22   to the car, opened the trunk and I could hear bullets

23   clinking.

24   Q    Who's he?

25   A    This young man right over here.

```
1   Q    The black male that you described there on that day?

2   A    Yes, sir.

3   Q    And so how did you observe him go to the trunk with the

4   gun?  Where were you when that happened?

5   A    Standing right up front at the front register.

6   Q    On the video did you not come into the camera view after

7   this black male had already come back in from the parking lot

8   with the pistol?

9   A    Yes.

10  Q    Okay.

11  A    Yes, I did.

12  Q    All right.  So then describe, if you would, where you

13  were when you would have seen the black male outside at the

14  trunk of his car with the pistol.

15  A    When he went out the door the first time, that's where he

16  went was right to his vehicle, opened up the trunk and got

17  into the trunk.

18  Q    Do you claim to have seen this on one of the video

19  cameras?

20  A    No.  I saw it with my own eyes.

21  Q    Okay.  And is that where you say that you saw him

22  retrieve this handgun that he then brought into the store?

23  A    No.

24  Q    Where did he get the handgun from, if you know?

25  A    It was already in his hand.
```

20

1  Q    Since this day in 2014 in November, to the best of your

2  recollection have you ever seen a photograph of

3  Mr. Goodwin-Bey presented to you at any other time?

4  A    No, sir.

5        MR. CANTIN:  I don't have any other questions, Your

6  Honor.  Thank you.

7        THE COURT:  Redirect?

8        MR. KELLEHER:  No, Your Honor.  Thank you.

9        THE COURT:  May this witness be excused?

10        MR. KELLEHER:  Yes, Your Honor.

11        THE COURT:  Thank you, ma'am.  You may step down and

12  you are excused.

13        MR. KELLEHER:  Government at this time calls John

14  Tavai to the witness stand.

15        THE COURT:  All right.

16        Raise your right hand and be sworn.

17  JOHN TAVAI, GOVERNMENT WITNESS, SWORN:

18                    DIRECT EXAMINATION

19  BY MR. KELLEHER:

20  Q    Please introduce yourself to the Court.

21  A    John Tavai.

22  Q    Back on November 30th of 2014, did you have a job?

23  A    Yeah.

24  Q    Do you recall where you were working?

25  A    Starmart.

21

1  Q    And on that date do you recall an unusual set of events,

2  something out of the ordinary?

3  A    Yeah.  Obviously, we got to work that afternoon and

4  somebody walked in with a pistol and it all went downhill from

5  there.

6  Q    First, you indicate that a man walked into the store with

7  a pistol.  Do you see that man in court today?

8  A    Yeah.

9  Q    Can you point him out and describe what he's wearing?

10  A    He's sitting right there.

11  Q    Can you tell me what he's wearing?

12  A    The striped outfit.

13         MR. KELLEHER:  Please let the record reflect the

14  identification of the defendant, Your Honor.

15  Q    (By Mr. Kelleher) Now, you indicate that he walked

16  into --

17         THE COURT:  Record will reflect that.

18         MR. KELLEHER:  I'm sorry, Your Honor.

19  Q    (By Mr. Kelleher) You indicated that he walked into the

20  store with a gun.  Was that the first time he had been in

21  your store that day?

22  A    No.  That was actually the second time I seen him there.

23  Saw him the day before, then saw him again the second day.

24  Q    Was there anything unusual about the defendant's demeanor

25  that day, November 30th, specifically?

```
 1   A    Yeah.  He came in the store and he talked about pimping.

 2   I think it was his wife that he was trying to pimp out that

 3   day and I turned it down.  And he just wasn't right.  It's

 4   just -- his demeanor wasn't right, you know.

 5   Q    Now, you indicate that he -- did he stay in the store

 6   this entire time or did he go back and forth?

 7   A    I think he went out once and came back in with the

 8   pistol.

 9   Q    Did you see where he retrieved the pistol from?

10   A    From his car.  I don't know where from his car but it was

11   in his car.

12   Q    What did he do with the pistol when he came back into the

13   store?

14   A    He walked up to the counter.  He had it in the glove and

15   it seemed like it was almost like he was trying to hand it to

16   me but, you know, it's -- kind of reacted.

17   Q    When you say you kind of reacted, what exactly did you do

18   when you saw the gun?

19   A    Just took it from him.

20   Q    Did you get a chance to see what kind of gun it was?

21   A    It was a handgun, 9-millimeter.

22   Q    I'll show you what's been marked as Government's

23   Exhibit 1.  Show you that.  Does that look familiar to you?

24   A    Yep.

25   Q    How so?
```

1 A    That's the one I took from him.

2 Q    Again, that's a 9-millimeter gun that appears to be

3 similar to the one you took from Mr. Goodwin-Bey, correct?

4 A    Yeah.

5 Q    When you say you took it from him, could you tell us who

6 you took it from specifically?

7 A    Mr. Goodwin.

8 Q    After removing the gun from the defendant's possession,

9 what took place next?

10 A    I don't remember the whole thing but I gave it to my boss

11 that was standing behind me and we said a few words.  It's

12 been a while back, I can't remember what was said, you know,

13 and me and the defendant walked out the front door and I was

14 trying to calm him down just in case he had another pistol in

15 the car.  You never know.

16 Q    What took place when you got to the parking lot?

17 A    He just left.  Got in his car and took off.

18 Q    Did you get a chance to see what kind of car he was

19 driving?

20 A    I know it was white.  I think it was a Lincoln or a Town

21 Car, I think.

22 Q    I'll show you what's been previously marked as

23 Government's Exhibit 5.  Do you recognize that vehicle?

24 A    Yes.

25 Q    How so?

24

1   A    That's the car he got in that day.

2   Q    Once he got -- departed in his vehicle, were you aware

3   that your boss called 911?

4   A    Yep.

5   Q    Did the police arrive on scene?

6   A    Yep.

7   Q    Can you give us an indication of how quickly the police

8   arrived?

9   A    Five -- five, ten minutes.

10  Q    Pretty quick?

11  A    Yeah.

12  Q    When the police arrived, did they talk to you?

13  A    Yeah.

14  Q    And did they actually have you identify the defendant out

15  there on the scene where they had him arrested?

16  A    Yes.

17  Q    Now, when you got out there did they give you any kind of

18  instructions or anything along those lines?

19  A    Yeah.  They just wanted to take me out to point out the

20  defendant and --

21       MR. CANTIN:  Your Honor, I'd like to go ahead and

22  pose an objection now and make a continuing objection to

23  everything addressed in the motion to suppress starts with the

24  911 call and then the reasonable suspicion that the police did

25  or did not have after.  So this line of questioning and then

25

```
1    the stand-up ID as well as everything found in the vehicle was
2    in that motion to suppress that have been overruled but I'd
3    like to make an objection to it in trial so we can preserve
4    those issues for appeal.
5              MR. KELLEHER:  Obviously, the motion to suppress has
6    been ruled upon.
7              THE COURT:  Right.  The Court understands.  And
8    there will be no waiver of those issues based on that
9    objection.  Anything that was raised in the motion to suppress
10   will be preserved for purposes of this trial.
11             MR. CANTIN:  Thank you, Your Honor.
12   Q    (By Mr. Kelleher) They drove you out to where the
13   defendant was, correct?
14   A    Yes, sir.
15   Q    Where was the defendant when you arrived on scene?
16   A    He was outside of his car on Chestnut Expressway.
17   Q    How far away was he from Starmart?
18   A    Not even a quarter mile.
19   Q    Quarter mile away?
20   A    Just about.
21   Q    When you got out there did they ask if that was the guy?
22   A    Yeah.
23   Q    Were you able to identify Mr. Goodwin-Bey as the person
24   who had the firearm?
25   A    Yes, sir.
```

26

```
1    Q    Did you have any doubt in your mind at that time?

2    A    No, sir.

3         MR. KELLEHER:  I have no further questions, Your

4    Honor.

5         THE COURT:  Cross-examination.

6                      CROSS-EXAMINATION

7    BY MR. CANTIN:

8    Q    Hello, Mr. Tavai.

9    A    How you doing, sir.

10   Q    My name is Shane Cantin.  Have we ever met before?  Don't

11   think so?

12   A    No.

13   Q    Okay.  How long had you worked at the Starmart on this

14   day in November 2014?

15   A    I had only been there for maybe four or five months.

16   Q    You speak kind of softly.  I'm having a hard time --

17   A    I'm sorry.  I'll stay close.

18   Q    So did I understand correctly that you said you had seen

19   Mr. Goodwin-Bey the day before this event?

20   A    Yes, sir.

21   Q    So he had come into the store when you were working?

22   A    Yes, sir.

23   Q    And that day when he came in -- which would have been the

24   29th of November?

25   A    Yes, sir.
```

27

```
1   Q    -- what transaction occurred that day?
2   A    Nothing.  He just came in the store, bought a few things
3   and walked out.
4   Q    Other than that time and then this day of November 30th,
5   do you recall having seen Mr. Goodwin-Bey at the store any
6   other occasions?
7   A    No.
8   Q    So just those two days?
9   A    Yes, sir.
10  Q    Now, on this day, which is November 30th that we're
11  talking about, had he been to the store earlier that day that
12  you remember?
13  A    I don't remember him being there earlier but I remember
14  when he came in.
15  Q    And prior to your testimony today, have you had a chance
16  to review any of the written reports from this event that
17  summarize what you told the officers that day?
18  A    No, sir.
19  Q    Have you had an opportunity to look at the store video to
20  see what transpired that day --
21  A    Yes, sir.
22  Q    -- to refresh your memory?
23  A    Yes, sir.
24  Q    When did you get a chance to look at the video?
25  A    Today.
```

28

```
 1   Q      Today?

 2   A      Yes, sir.

 3   Q      Did you watch the whole video that involved the

 4   transaction with Mr. Goodwin-Bey when he first came to the

 5   store to when he left?

 6   A      No, sir.

 7   Q      All right.  You just watched part of it, then, correct?

 8   A      Yeah, bits and parts of it.

 9   Q      So you're familiar with on this day that he came into the

10   store and that you and he engaged in a couple-minute

11   conversation where you ultimately provided him the telephone

12   to use?

13   A      Yeah.

14   Q      Do you remember what that was about?

15   A      He said he was looking for somebody and he said he needed

16   a phone, so I gave him the store phone.

17   Q      And do I understand that you describe in your testimony

18   that he seemed to be under the influence of something?

19   A      Yes, sir.

20   Q      Expand on that.  What do you mean?

21   A      Just by the way he was acting, his demeanor.  His whole

22   demeanor was -- you know, it was somebody that's -- looked

23   like somebody that was on drugs, you know.  We see a lot of

24   people like that coming in that store every day, you know.

25   Q      And so on the video you let him use the phone, which he
```

1    does?

2    A    Yeah.

3    Q    Then you and he have a little bit more of a conversation.

4    Do you remember what that was about?

5    A    No, I don't recall.  I know he was looking for somebody.

6    That's the reason why I gave him the phone.  It could have

7    been about that.

8    Q    Then on the video we see him leave the store for just a

9    short period of time and then come back in with what you

10    describe to be this handgun in a glove?

11    A    Yeah.

12    Q    Before he left the store did you know that he was going

13    to retrieve this pistol?  Did you have a discussion with him

14    about that?

15    A    No.

16    Q    When he came back in, the video shows -- and I think

17    Ms. Barton kind of corroborates when she testifies -- he lays

18    it on the counter and pushes it towards you?

19    A    He kind of like had it in his open hand.  He was moving

20    it towards me, you know, while he was talking to me.  I kind

21    of took it out of his hand, you know.

22    Q    Right.  So he hands it to you and you take it?

23    A    I took it, gave it to my boss.

24    Q    Am I right in saying that at no time during this -- I'll

25    call it the second transaction because he leaves the store and

30

```
 1   comes back in the second time, right?

 2   A    Yeah.

 3   Q    So during the second transaction you and he aren't

 4   arguing, correct?

 5   A    I don't remember if I did argue with him or -- I mean,

 6   it's been a while back, you know, so it -- I don't know if we

 7   were arguing or not.  But I know I was trying to calm him down

 8   because there was a few kids in the store.  I think my boss's

 9   grandson was in there with us.

10   Q    Fair to say your main concern was the presence of a

11   weapon?

12   A    Yeah.  You know, of course the kids also in the store,

13   you know.

14   Q    This black male that was there that had handed you the

15   pistol, he wasn't threatening you, was he?

16   A    It -- I mean, I felt threatened for my life the way he

17   was acting, yes.  It was more threatening, that is correct.

18   Q    Just, again, to clarify that, the presence of him

19   appearing to be under the influence of drugs and the presence

20   of now a pistol, that caused you to be concerned?

21   A    Yeah.

22   Q    But he himself didn't say anything harmful to you or

23   threatening to you directly, correct?

24   A    I don't remember.  I don't.

25   Q    You and he didn't scuffle?
```

31

```
 1   A      No.

 2   Q      In fact, after he hands you this pistol, we see in the

 3   video that you then turn around and provide it to Ms. Barton;

 4   do you remember that?

 5   A      Yeah.

 6   Q      Then you go out from behind the counter and walk outside

 7   with him?

 8   A      Yes, sir.

 9   Q      You stay outside with him talking on the sidewalk for

10   another three, almost four minutes?

11   A      Yes, sir.

12   Q      You're outside having a conversation with him about what?

13   A      Trying to calm him down.  I was worried he might have

14   another one in the car, you know, things like this.  I mean,

15   you never know.

16   Q      Did he ever said he had another gun in the car?

17   A      No.

18   Q      Did it ever turn into a situation outside where he is now

19   started to become threatening directly to you?

20   A      Yeah, when he starting walking toward his car.

21   Q      All right.  But did he say anything to you that you took

22   to be a threat?

23   A      No.

24   Q      In fact, you were encouraging him to leave or to stay?

25   A      To leave.
```

32

1    Q    To leave.  Were you aware that the police had been

2    called?

3    A    At the time, no.

4    Q    So you were saying, Hey, dude, just calm down, get out of

5    here?

6    A    Yeah.

7    Q    Or words to that effect?

8    A    Yeah, something to that effect.

9    Q    You're aware that there's video cameras within the store

10   at various locations?

11   A    Yeah.

12   Q    And that's some of the video that you had an opportunity

13   to watch?

14   A    A little bit, yeah.

15   Q    Are you aware if there are cameras outside the store that

16   record the parking lot area?

17   A    I don't think we have cameras outside the store.

18   Q    How long did you continue to work at Starmart after this

19   date in November?

20   A    A couple more months.

21   Q    Were you there when Ms. Barton claims to have located

22   some bullets, some ammunition out in the parking lot?

23   A    Yes, sir.

24   Q    Did you go outside at all to help her look for or

25   retrieve any of these?

                                   33

```
 1   A     Yes, sir.
 2   Q     Did you find some as well?
 3   A     Yeah, located a few by the gas pump, rolled down from
 4   where he was parked and then where he was parked.
 5   Q     I apologize.  I only caught the last end of that.
 6   A     We found a few ammos.  I was walking down to check the
 7   trash by the pumps and some of it was down there and some of
 8   it was up to where he was parked at.
 9   Q     Okay.  And you said something about it rolling?
10   A     Yeah.  A lot of ammos rolling down to where the pumps
11   were, I think, you know.
12   Q     Okay.  Anywhere else in the parking lot you or that you
13   recall Ms. Barton found any ammunition?
14   A     No, sir.
15             MR. CANTIN:  No other questions, Your Honor.
16             THE COURT:  Redirect?
17             MR. KELLEHER:  Nothing further, Your Honor.
18             THE COURT:  May this witness be excused?
19             MR. KELLEHER:  Yes, Your Honor.
20             THE COURT:  Thank you, sir, for your time.  You're
21   excused.
22             THE WITNESS:  Thank you, sir.
23             MR. KELLEHER:  Government calls Jennifer Sandage to
24   the witness stand.
25             THE COURT:  Come forward, raise your right hand to
```

34

1    be sworn.

2    JENNIFER SANDAGE, GOVERNMENT WITNESS, SWORN:

3                      DIRECT EXAMINATION

4    BY MR. KELLEHER:

5    Q    Ma'am, will you please introduce yourself to the Court?

6    A    My name's Jennifer Sandage.

7    Q    Where are you presently employed?

8    A    Springfield Police Department.

9    Q    How long have you worked there?

10   A    Just over ten years.

11   Q    I want to direct your attention back to November 30th of

12   2014.  Were you employed on this date?

13   A    Yes, sir.

14   Q    What was your responsibility?

15   A    I worked patrol, so answering calls for service.

16   Q    And at approximately 2:30 that afternoon did you have

17   occasion to respond to a call at the Starmart?

18   A    I did.

19   Q    Could you describe to the judge how that call came out

20   and what it was in reference to?

21   A    Black male in a white car causing some sort of

22   disturbance and had a firearm which the clerks took from him.

23   Q    Was a good description of the car broadcast by the 911

24   dispatcher?

25   A    Yes, sir.

                              35

```
1   Q      Did it include a license plate number?

2   A      Yes, sir.

3   Q      Did you determine what role you had in responding to that

4   call?

5   A      I went immediately to the gas station.

6   Q      Were there other officers who also responded to that

7   call?

8   A      Yes.

9   Q      What was their area of responsibility?

10  A      Checking the area for the suspect.

11  Q      Now, when you went to the Starmart, did you have occasion

12  to meet with any of the employees?

13  A      I did.

14  Q      And specifically did you meet with a Jennifer Barton?

15  A      I did.

16  Q      What if anything did she tell you about this 911 call,

17  this disturbance?

18  A      That the male had been coming in all day, didn't know

19  what was wrong with him, possibly drug induced, possibly

20  mental disorder, maybe seeing controlled substance use or

21  mental disorder, coming in the store all day.  At the last I

22  guess he produced a firearm which one of her employees took

23  from him.

24  Q      Were you able to obtain that firearm from Ms. Barton?

25  A      Both, yes.  Yes, sir.
```

36

1   Q   And I will show you Government's Exhibit 1. If you

2 would, could you open that box and tell me what's inside?

3   A   Yes, sir. It's the Ruger that I obtained from Mr. Tavai

4 and Ms. Barton.

5   Q   Was the Ruger loaded when you confiscated it?

6   A   I don't recall at that point because I didn't clear it.

7   Q   Was there a magazine in the gun?

8   A   Yes, sir.

9   Q   Who actually cleared the gun and removed the bullets?

10   A   Corporal Chris Nuccio cleared the firearm.

11         MR. KELLEHER: Your Honor, move to admit

12 Government's Exhibit 1.

13         MR. CANTIN: No objection to 1, Your Honor.

14         THE COURT: Government's Exhibit 1 will be admitted.

15   Q   (By Mr. Kelleher) When Officer Nuccio cleared the gun,

16 what is the procedure used to document that fact?

17   A   We document if there was one in the chamber, how many

18 rounds was in the magazine, what kind of ammo.

19   Q   Does he document who actually sees the items in the

20 magazine?

21   A   I was there when he processed it, yes, sir.

22   Q   Were you able to witness him actually clearing the

23 firearm?

24   A   Yes, sir.

25   Q   Show you Government's Exhibit 2 and 2.1 and I'd ask that

37

1  you identify those.

2  A     Yes.  They are —— they're the ammunition, the magazine

3  that was removed from the firearm.

4  Q     How was the gun loaded?

5  A     There was one in the chamber and the magazine was loaded.

6          MR. KELLEHER:  Move to admit Government's Exhibits 2

7  and 2.1 at this time, Your Honor.

8          MR. CANTIN:  No objection, Your Honor.

9          THE COURT:  Government's Exhibit 2 and 2.1 will be

10  admitted.

11  Q     (By Mr. Kelleher) And was the brand of ammunition

12  documented when the corporal logged it?

13  A     Yes, sir.

14  Q     What brand ammunition was ——

15  A     Perfecta.

16  Q     Thank you.

17          Now, after taking the firearm into possession, what

18  role did you then have on scene?

19  A     I secured that firearm in the trunk of my patrol vehicle

20  and I interviewed the two employees.

21  Q     After interviewing the employees what, if anything, did

22  you do to establish the identity of the person who was in

23  possession of that firearm?

24  A     Sergeant Laub, which was my boss at the time, and another

25  officer —— I believe his name was Miller —— had located and

                                38

1 | stopped the vehicle a short distance away, near Orchard Crest

2 | and Chestnut, and I was asked to bring Mr. Tavai down to

3 | identify, to show up ID on the male that they had stopped.

4 | Q    Did Mr. Tavai positively identify the person who had been

5 | stopped?

6 | A    He told me that the person that was pulled over was the

7 | person that he got the firearm off of.

8 | Q    Did you see that person in court today?

9 | A    Yes, sir.

10 | Q    Can you point him out, describe what he's wearing?

11 | A    Yes.  He's wearing the black-and-white striped shirt

12 | sitting next to the man with the blue jacket, green tie.

13 |         MR. KELLEHER:  Please let the record reflect

14 | identification of the defendant.

15 |         THE COURT:  So reflected.

16 | Q    (By Mr. Kelleher) Did you have occasion to take a look

17 | at the vehicle that Mr. Goodwin-Bey was operating that day?

18 | A    I did.

19 | Q    What was your role in terms of looking at the vehicle?

20 | A    Just assisting Corporal Nuccio.  He was the corporal so

21 | he was the one in charge of photographing, doing any of that.

22 | I was there to assist him.

23 | Q    I'm first going to show you Government's Exhibit 5.

24 | Could you identify that photograph for me, or identify the

25 | item that's depicted in that photograph?

```
1   A    Yes, sir.  That's the car.

2   Q    Was that the car that the defendant was driving?

3   A    I don't know if he was driving it.  When I got there, he

4   was outside the vehicle.

5   Q    When you took a look inside the car, did you note

6   anything of note?

7   A    Yes, sir.

8   Q    What was that?

9   A    Just loose ammo in a box, empty box of ammo, the

10  packaging.

11  Q    Show you what's been marked as Government's Exhibit 6 and

12  7.  Could you tell us what is depicted in those photographs?

13  A    Yes, sir.  There's a Perfecta packaging for ammo and then

14  in this one there is loose ammo.

15  Q    Was that readily visible when you entered the car?

16  A    Yes, sir.

17       MR. KELLEHER:  I move to admit Government's

18  Exhibit 6 and 7 at this time.

19       MR. CANTIN:  No objection, Your Honor.

20       THE COURT:  Government's Exhibit 6 and 7 will be

21  admitted.

22  Q    (By Mr. Kelleher) With regard to those items, did you

23  take custody of them at that time?

24  A    I did not.

25  Q    What did you do about the items of ammunition and other
```

40

1   possible evidence in the car?

2   A    They were left inside the vehicle.

3   Q    Was the car secured by yourself?

4   A    Myself and Corporal Nuccio, yes, sir.

5   Q    Why did you leave those items inside the car?

6   A    Because we were going to seal it up and hold it for CIS

7   for further investigation.

8            MR. KELLEHER:  No further questions, Your Honor.

9            THE COURT:  Did you offer 6 and 7?

10           MR. KELLEHER:  I believe, yes, I did, Your Honor.

11           THE COURT:  Have you offered 8?

12           MR. KELLEHER:  I have not offered 8 yet.

13           THE COURT:  Okay.  Good.

14           Cross-examination.

15           MR. CANTIN:  I don't have any questions, Your Honor.

16   Thank you.

17           THE COURT:  All right.  This witness may be excused,

18   then.

19           You may step down.  Thank you.

20           THE WITNESS:  Yes, sir.

21           MR. KELLEHER:  Government next calls Jason Laub.

22           THE COURT:  Step forward, raise your right hand to

23   be sworn.

24   JASON LAUB, GOVERNMENT WITNESS, SWORN:

25

                                    41

DIRECT EXAMINATION

2    BY MR. KELLEHER:

3    Q    Sir, please introduce yourself to the Court.

4    A    Jason Laub.

5    Q    Where are you presently employed?

6    A    Springfield, Missouri, Police Department.

7    Q    What is your rank?

8    A    Lieutenant.

9    Q    How long have you worked for the Springfield Police

10   Department?

11   A    Eighteen years.

12   Q    Were you on duty back on November 30th of 2014?

13   A    Yes, sir.

14   Q    Did you participate in the investigation of one Scott

15   Goodwin-Bey?

16   A    Yes, sir.

17   Q    Would you describe to the Court your involvement or how

18   you initially came into contact with Mr. Goodwin-Bey?

19   A    Yes, sir.  It was close to three o'clock in the afternoon

20   and we got a call for service, myself and Officer Jennifer

21   Sandage, to respond to the Cenex gas station at the 3900 block

22   of West Chestnut Expressway.  Call indicated black male pulled

23   into the lot, he was in possession of a firearm.  The

24   employee -- he gave that firearm to the employee and he was

25   acting strangely.  The employee described the individual was

                                  42

1    driving a white four-door Lincoln car with Missouri plate

2    of -- I believe it was Sam-Lincoln-4-Adam-5-David.  Yeah,

3    SL4-A5D.

4    Q    SL4-A5D?

5    A    That's correct.

6    Q    What was your role in terms of this investigation?

7    A    I was responding with Officer Jennifer Charleston as a

8    back-up officer.  When I was en route to that location,

9    Officer Miller, he works for a different squad, he happened to

10   be in the area a little closer than we were, he got on the

11   radio and advised that he noticed a white Lincoln parked in

12   front of the Casey's General Store there in the 4100 block of

13   Chestnut Expressway.  I decided at that point that I would

14   allow Sergeant Charles- -- Sandage to respond to the Cenex gas

15   station and I'd go meet with Officer Miller to contact the

16   occupant of the Lincoln.

17   Q    Is Cenex the same thing as Starmart?

18   A    That's correct.  The sign out by the road says Cenex.

19   The sign above -- or on the building itself says Starmart.

20   Q    Now, based on the call did you have occasion to pull over

21   the white Lincoln Town Car?

22   A    Yes, sir, I did.  While I was en route to the Casey's

23   General Store, Sandage arrived at the gas station and she

24   contacted the clerk and she got on the radio and said that she

25   had possession of the weapon and that she had -- the employee

                                    43

had taken it from Mr. Goodwin-Bey.  I continued towards
Casey's General Store.  When I approached the gas station, I
saw the white Lincoln Town Car backing from a spot.  I turned
onto Orchard Crest getting ready to turn into Casey's General
Store.  Our vehicles actually met on the Casey's lot.  I got
turned around on the Casey's lot, pulled in behind the Lincoln
and conducted a traffic stop there at Chestnut Expressway and
Orchard Crest.

Q    Were you able to make contact with the driver?

A    Yes.

Q    Do you see the driver of that vehicle in court today?

A    Yes, I do.

Q    Can describe what he's wearing?

A    Gentleman over there with the black-and-gray shirt,
horizontal stripes.

MR. KELLEHER:  Let the record reflect identification
of the defendant.

THE COURT:  It will so reflect.

Q    (By Mr. Kelleher) I'll show you what's been marked as
Government's Exhibit 5.  Is that, in fact, the vehicle that
you pulled over on that date?

A    Yes, it is.

Q    Once you had the defendant's vehicle stopped, what action
did you then take?

A    I activated my lights, he pulled over to the side of the

44

road.  We were facing eastbound on the southbound lanes of

Chestnut Expressway.  Once both vehicles stopped, he exited,

put hands above his head.  I instructed him to come back to my

location.  I frisked him, patted him down for weapons -- there

was no weapons found -- gave him brief explanation of the

reason of the stop.  His response is that he wasn't -- didn't

have a weapon, said that he had just been driving around and

he hadn't committed any crimes.

Q    Okay.  Did there come a time where Officer Sandage

responded back to your scene?

A    Yes, sir.  I asked him -- I think follow-up question was

where you been driving around and he said something similar to

I plead the Fifth.  At that point I had Officer Miller stand

by Mr. Goodwin-Bey.  I went back and made a phone call to

Officer Sandage who still at the gas station.  We made

coordination that she would have the employee -- if the

employee agreed to, which they did, she would give the

employee a ride down to our location to make sure that it

was -- the same individual that I was with was the one they

had taken the weapon from.

Q    Without getting into any additional details, was

Mr. Goodwin-Bey taken into custody at the conclusion of this

incident?

A    Yes, sir, that's correct.

          MR. KELLEHER:  I don't believe I have any further

1    questions, Your Honor.

2              THE COURT:  Cross-examination.

3              MR. CANTIN:  I have no questions, Your Honor.  Thank

4    you.

5              THE COURT:  All right.  May the lieutenant be

6    discharged?

7              MR. KELLEHER:  Yes, Your Honor.

8              THE COURT:  Thank you, sir, for your time.

9              THE WITNESS:  Thank you.

10             MR. KELLEHER:  The government calls Chris Barb to

11   the stand.

12   CHRIS BARB, GOVERNMENT WITNESS, SWORN:

13                        DIRECT EXAMINATION

14   BY MR. KELLEHER:

15   Q    Sir, will you please introduce yourself to the Court.

16   A    My name is Chris Barb.

17   Q    Where do you presently work?

18   A    Springfield, Missouri, Police Department.

19   Q    How long have you worked there?

20   A    Approximately 18 years.

21   Q    Were you employed back in November and December of 2014?

22   A    Yes, sir.

23   Q    And did you have occasion to participate into an

24   investigation of Scott Goodwin-Bey?

25   A    Yes, I did.

46

Q    I want to direct your attention specifically to the
automobile that Mr. Goodwin-Bey was driving on November 30th
of 2014.  Did you have occasion to execute a search warrant
upon that car on January 7th of 2015?

A    Yes, sir.

Q    And I'll first show you Government's Exhibit 5.  If you
would, could you tell me what is that picture of?

A    Yes, sir.  This is a picture of the Lincoln Town Car
parked in the Premiere Towing parking garage prior to the
search warrant being executed.

Q    So that is, in fact, the car that you executed the search
warrant upon?

A    Yes, sir.

Q    What if anything did you locate within the vehicle,
specifically items of evidentiary value to the incident that
took place at the Starmart on November 30th of 2014?

A    Located some rounds of ammunition as well as an empty
ammunition box.

Q    Were these documented first by taking photographs before
being removed from the car?

A    They were.

Q    I will show you Government Exhibit 6 at this time.  Could
you tell me what that is a photograph of?

A    Yes, sir.  It's a photograph of an empty Perfecta
ammunition box.

47

1  Q    And I will show you what's been marked as Government's
2  Exhibit 12.  Can you tell me what that is?
3  A    Yes, sir.  That is the box after it was collected.
4           MR. KELLEHER:  Your Honor, I move to admit
5  Government's Exhibits 8 and 12.
6           MR. CANTIN:  No objection, Your Honor.
7           THE COURT:  Government's Exhibits 8 and 12 will be
8  admitted.
9  Q    (By Mr. Kelleher) Show you what's been marked as
10 Government's Exhibit 7.  Can you tell us what that is?
11 A    Yes.  That's a photograph of a single -- actually,
12 there's two rounds in the driver's floorboard of the vehicle.
13 Q    And that particular round, the first one is marked by
14 a -- note that it's marked by a yellow placard?
15 A    Correct.
16 Q    Was there one next to it that had been similarly marked
17 with a placard that said four?
18 A    Yes, sir.
19 Q    Were those rounds ultimately retrieved?
20 A    They were.
21 Q    I'll show you what's been marked as Government's
22 Exhibit 11.1 and 11.3.  Can you tell me what those items are?
23 A    Yes.  These are the two rounds collected as three and
24 four from the driver's side floorboard.
25           MR. KELLEHER:  Your Honor, I'd move to admit

                                  48

Government's Exhibit 7 and Government's Exhibits 11.3 and
11.1.

THE COURT:  I have 7 already has been admitted.

MR. KELLEHER:  I think I made a mistake on that.  It
should have been Government's Exhibit 6 is the box of Perfecta
ammunition.

THE COURT:  All right.

MR. CANTIN:  No objection to any of those.

THE COURT:  All right.  Well, 6, 8, 11.1, 11.3 are
all admitted.

Q    (By Mr. Kelleher) I would next ask you about
Government's Exhibit 8.  Describe what is depicted in that
photograph.

A    Yes.  This is a photograph of another single 9-millimeter
Perfecta round located between the driver's seat and the
center console.

Q    One has a placard indicating five?

A    That's correct.

Q    Could you tell us what's contained in what is marked as
Government's 11.2?

A    Yes.  That is the 9-millimeter round collected as placard
No. 5.

MR. KELLEHER:  I'd move to admit Government's
Exhibit 8 and Government's Exhibit 11.2.

MR. CANTIN:  No objection, Your Honor.

49

1          THE COURT:  All right.  Well, I show 8 has already
2    been admitted, but regardless 8 is or has been admitted and
3    11.2 will be admitted.
4    Q    (By Mr. Kelleher) And I would also ask you what is
5    depicted in Government's Exhibit 9?
6    A    This is 11 rounds of Perfecta 9-millimeter ammunition
7    found in a box inside the trunk of the Town Car.
8    Q    Was there a placard to mark what was ultimately seized
9    there?
10   A    Yes, sir, No. 7.
11   Q    I'll go ahead and show you Government's Exhibit 11.4.
12   A    Yes, sir.  That is the 11 rounds collected from the box.
13           MR. KELLEHER:  I would move to admit Government's
14   Exhibit 9 and Government's Exhibits 11.4.
15           MR. CANTIN:  No objection.
16           THE COURT:  Government's Exhibit 9 and Government's
17   Exhibit 11.4 will be admitted.
18   Q    (By Mr. Kelleher) Did you also locate documentation
19   that would indicate who owned that vehicle?
20   A    Yes.
21   Q    I will show you a photograph marked Government's
22   Exhibit 10.  Could you tell us what that is of?
23   A    This is an automotive receipt from Wal-Mart indicating
24   that Scott Goodwin-Bey had some work done on a 2000 Lincoln
25   Town Car.

                                    50

1          MR. KELLEHER:  Your Honor, I would move to admit
2    Government's Exhibit 10.
3          MR. CANTIN:  No objection.
4    Q    (By Mr. Kelleher) Where was that item located?
5    A    It was located in the glove box.
6          THE COURT:  Exhibit 10 will be admitted.
7    Q    (By Mr. Kelleher) Now, did you also have occasion to
8    respond to the Starmart yourself?
9    A    I did.
10   Q    What was that in reference to?
11   A    Went there to collect video of the incident.
12   Q    Did you collect anything else when you went to collect
13   video?
14   A    I did.  The manager provided me with some additional
15   ammunition found in the parking lot.
16   Q    I will show you what's been marked as Government's
17   Exhibit 13.  Could you identify the package and its contents?
18   A    Yes.  This is five rounds that I collected from
19   Ms. Barton when she brought it in from the parking lot.
20   Q    With regard to the rounds of ammunition, were they all
21   the same type of brand?
22   A    Yes, they were.  They are also Perfecta.
23          MR. KELLEHER:  Your Honor, I'd move to admit
24   Government's Exhibit 13.
25          THE COURT:  I want to ask a question of the last

1  question you asked.  When you said were the same, are you
2  saying the five are the same or the five are the same as
3  something else?
4  Q    (By Mr. Kelleher) With regard to all the ammunition,
5  the ammunition seized from the vehicle as well as the
6  ammunition you obtained from the store clerk at Starmart,
7  were they all the same brand?
8  A    All Perfecta brand.
9         MR. KELLEHER:  Thank you, Your Honor.
10        Move to admit Government's Exhibit 13, if I haven't
11  done so already.
12        THE COURT:  Any objection?
13        MR. CANTIN:  No objection, Your Honor.
14        THE COURT:  Thirteen will be admitted.
15  Q    (By Mr. Kelleher) As it pertains to the incident that
16  took place on November 30th of 2014, was that the end of
17  your involvement?
18  A    It was.
19        MR. KELLEHER:  I have no further questions, Your
20  Honor.
21        THE COURT:  Cross-examination?
22                  CROSS-EXAMINATION
23  BY MR. CANTIN:
24  Q    Sir, when you processed this vehicle subject to the
25  search warrant and retrieved these items that you've testified

52

```
 1   to, did you retrieve them using gloves in a manner to preserve
 2   any trace evidence?
 3   A    Yes, sir.
 4   Q    Did you request any lab testing to determine the presence
 5   of any fingerprints on any of the items that you testified to?
 6   A    I did not.
 7   Q    Including the box, for example?
 8   A    Correct.
 9          MR. CANTIN:  I don't have any other questions, Your
10   Honor.
11          THE COURT:  Redirect?
12          MR. KELLEHER:  No, Your Honor.
13          THE COURT:  If not, may this witness be excused?
14          MR. KELLEHER:  Yes, Your Honor.
15          THE COURT:  You are excused.  Thank you, sir.
16          MR. KELLEHER:  Government at this time calls Special
17   Agent Brian Fox.
18          THE COURT:  Step forward, raise your right hand, if
19   you would.
20   BRIAN FOX, GOVERNMENT WITNESS, SWORN:
21                     DIRECT EXAMINATION
22   BY MR. KELLEHER:
23   Q    Sir, would you please introduce yourself to the Court.
24   A    My name is Brian Fox.  I'm a special agent with the
25   Bureau of the Alcohol, Tobacco, Firearms and Explosives.
```

1  Q    How long have you worked for ATF?

2  A    Eight years.

3  Q    What are your current duties and responsibilities?

4  A    My primary responsibility is the investigation of the

5  violation of the federal firearms laws.  I also have duties to

6  include being the evidence custodian for our office.  I'm

7  also -- take care of doing the interstate nexus

8  determinations.

9  Q    With regard to making interstate nexus determinations,

10  could you explain what that actually entails?

11  A    Yes.  In 2014 I went to our firearms technology branch

12  which is headquartered in Martinsburg, West Virginia, where I

13  underwent a week's training in the firearms interstate nexus

14  training.  I learned to -- about the markings on the firearms,

15  how to identify the firearms.  Then I've also had an

16  opportunity to go through training, some advanced interstate

17  nexus training where I've had to go to the actual firearms

18  manufacturers to see the process of firearms being made.

19  Q    Does that also include specialized training with regard

20  to ammunition?

21  A    Yes, it does.

22  Q    So in the course of your duties with ATF, have you had

23  occasion to examine firearms and determine their

24  identification and origin?

25  A    Yes, many times.

54

1   Q    And would you describe the procedures that you follow to
2   determine where firearms and ammunition are manufactured?
3   A    First thing I need to do is to actually physically
4   examine the firearm, to look at the markings that are on the
5   firearm.  There are certain markings that are required by ATF
6   to be placed on those firearms and that will begin to help me
7   in my determination of where the firearm was manufactured.
8   Q    Okay.  I'll first show you what's been marked as
9   Government's Exhibit 1.  If you would, could you please take a
10  look at the contents of the box?
11  A    Yes.
12  Q    Did you have occasion to examine that particular firearm?
13  A    Yes, I did.
14  Q    Again, what were you examining the firearm to determine?
15  A    I was looking for the markings on the firearm to include
16  the manufacturer, the model, the caliber, and the serial
17  number of the firearm and also any other markings to include
18  where the firearm could have possibly been manufactured or
19  where the company was headquartered.
20  Q    Are you familiar with this particular firearm?
21  A    Yes, I am.
22  Q    What is this firearm?
23  A    This firearm is a Ruger Model P89DC 9-millimeter pistol.
24  The serial number on it is 30356600.
25  Q    Are there -- is there any significance with regard to the

55

1  markings actually contained on that particular firearm?

2  A    This firearm shows that it was manufactured by Sturm,

3  Ruger and Company in Southport, Connecticut.  I know from my

4  training and experience as well as going to the Ruger firearms

5  plant that Southport, Connecticut, is actually the company's

6  headquarters and not necessarily where this particular firearm

7  was made.

8  Q    And were you able to determine where this particular

9  firearm was manufactured?

10 A    Yes, I was.

11 Q    Where was it manufactured?

12 A    This model of pistol was manufactured in the state of

13 Arizona.

14 Q    How do you know that?

15 A    Through my -- first off, going to the firearms -- to

16 Ruger's company, their plant in New Hampshire.  We were

17 provided with a tour and they told us that all of their P

18 model pistols are manufactured in Prescott, Arizona.  They

19 said the P stands for Prescott.  And also with information

20 that's available to me through ATF I was also able to know

21 that these firearms -- this particular firearm was

22 manufactured in the state of Arizona.

23 Q    Consequently, would it be your opinion that that firearm

24 did in fact travel in interstate commerce?

25 A    Yes.

56

```
 1   Q    I'll also show you what's been marked as Government's
 2   Exhibits 2.1, 11.1, 11.3, 11.4, 13, and 12.  Could you take a
 3   look at those for me?
 4   A    Yes.
 5   Q    And did you, in fact, have a chance to examine each of
 6   those items?
 7   A    I did.
 8   Q    Could you describe what those items are specifically?
 9   A    This ammunition is 9-millimeter caliber ammunition.  I
10   looked at the head stamp, which is the end of the cartridge
11   that contained where the primer is located.  On there lists
12   what particular brand and caliber the ammunition is.
13   Q    Did the stamp on the ammunition actually indicate the
14   make, model of that ammunition?
15   A    It showed the brand name of the ammunition.
16   Q    What was the brand name?
17   A    The brand name is Perfecta.
18   Q    With regard to this ammunition, were you able to make a
19   determination of where it was manufactured?
20   A    Yes, I was.
21   Q    Does that pertain to each of those exhibits?
22   A    Yes, it does.
23   Q    Could you tell us where that ammunition was manufactured?
24   A    My research indicated that this ammunition was
25   manufactured in the country of Italy.
```

57

1    Q    What do you base that opinion on?

2    A    I had to go through and find what information was

3    available to me through ATF, and through other interstate

4    nexus experts I had learned that this ammunition was

5    manufactured by the company Fiocchi in Italy and I contacted

6    the distributor for this particular ammunition and verified it

7    was, in fact, made in Italy.

8    Q    I'd also like to direct your attention specifically to

9    Government's Exhibit 12.  Could you tell us exactly what that

10   is?

11   A    It's a cardboard box.  On it it shows the brand name of

12   being Perfecta.  It's 9-millimeter Ruger ammunition and it

13   shows that it was made in Italy.

14   Q    Again, would that box be consistent with the ammunition

15   itself?

16   A    Yes, it would.

17   Q    So, again, in your opinion would it be fair to say that

18   that ammunition traveled in interstate commerce prior to

19   November 30th of 2014?

20   A    Yes, it would.

21         MR. KELLEHER:  I don't believe I have any additional

22   questions, Your Honor.

23         THE COURT:  Cross-examination.

24         MR. CANTIN:  No questions, Your Honor.  Thank you.

25         THE COURT:  May this witness be excused?

```
 1              MR. KELLEHER:  Yes, Your Honor.

 2              THE COURT:  Thank you, sir.

 3              THE WITNESS:  Thank you.

 4              MR. KELLEHER:  Finally, Your Honor, the government

 5    calls Missy Potter to the stand.

 6              THE COURT:  Raise your right hand, please.

 7    MELISSA POTTER, GOVERNMENT WITNESS, SWORN:

 8                        DIRECT EXAMINATION

 9    BY MR. KELLEHER:

10    Q    Ma'am, would you please introduce yourself to the Court.

11    A    Melissa Potter, United States Probation and Pretrial

12    Services Officer.

13    Q    And you're actually employed in this building?

14    A    Yes.

15    Q    How long have you been a probation officer?

16    A    Since September 19th of 2005.

17    Q    Are you familiar with one Scott Goodwin—Bey?

18    A    Yes.

19    Q    Do you see him here in court?

20    A    Yes.

21    Q    Could you point him out and describe what he's wearing?

22    A    He's at counsel's table next to Mr. Cantin wearing the

23    black—and—gray stripes.

24              MR. KELLEHER:  Please let the record reflect

25    identification of Mr. Goodwin—Bey.
```

1        THE COURT:  It will so reflect.

2   Q    (By Mr. Kelleher) Have you come in contact with

3   Mr. Goodwin-Bey?

4   A    Yes.

5   Q    What were the circumstances of your first encounters with

6   Mr. Goodwin-Bey?

7   A    It was when Mr. Goodwin-Bey was convicted in this court

8   back in 2008, I believe.

9   Q    Now, what was your specific -- what were your duties with

10  regards to that proceedings?

11  A    I was assigned the presentence investigation report for

12  the Court.

13  Q    When you prepare a presentence investigation report, do

14  you first note what the charge is that the defendant has been

15  convicted of as well as the plea agreements and other

16  documentation?

17  A    Yes.

18  Q    I'm going to show you what's been marked as Government's

19  Exhibit 14.  Could you tell me what those documents pertain

20  to?

21  A    This is an indictment filed in 2007 charging

22  Mr. Goodwin-Bey with being a convicted felon in possession of

23  a firearm.

24  Q    Is that, in fact, the charge which he pleaded guilty to

25  that you were tasked with the responsibility of doing a

60

1  presentence investigation report?

2  A     Yes.

3  Q     Are there also additional documents included there?

4  Specifically I direct your attention to the plea agreement.  I

5  believe that's the last document in that package.

6  A     Yes.

7  Q     When you conduct your presentence investigation report,

8  do you, in fact, review in quite a bit of detail the

9  agreements made in the plea agreement?

10  A     Yes.

11  Q     And I would direct your attention to page 3 of the plea

12  agreement.  Does that specifically indicate that the defendant

13  admitted to being convicted of a number of prior felonies?

14  A     Yes, at the top of page 3.

15  Q     And as part of your duties, did you, in fact, verify that

16  he had been convicted of those particular felonies?

17  A     Yes, I did.

18  Q     How do you go about verifying -- making those

19  verifications?

20  A     We request certified records from the courts.  In this

21  case Greene County and the circuit court for the City of

22  St. Louis.

23  Q     And I'll show you what's been marked as Government's

24  Exhibit 15, 16, 17, and 18.  And if you would, could you

25  identify those in turn?

61

1   A    Document 15, Exhibit 15, I guess, is a copy of the

2   judgment and commitment order in this case.  Or the 1997 case.

3   I'm sorry.

4   Q    Also out of the Western District of Missouri?

5   A    Yes.

6   Q    And next I direct your attention to Government's

7   Exhibit 16.  Does that pertain to that Greene County

8   conviction that you were referring to?

9   A    Yes, it does.

10  Q    And Government's Exhibit 17?

11  A    These are the documents for the St. Louis convictions.

12  Q    And, finally, what is Government's Exhibit 18?

13  A    This is a Department of Corrections Adult Institutions

14  face sheet.

15  Q    Are each of those documents certified?

16  A    Yes, they appear to be.

17        MR. KELLEHER:  Your Honor, I'd move to admit

18  Government's Exhibits 14, 15, 16, 17, and 18 at this time.

19        MR. CANTIN:  No objection, Your Honor.

20        THE COURT:  Government's Exhibits 14, 15, 16, 17,

21  and 18 will be admitted.

22  Q    (By Mr. Kelleher) Again, you wrote and authored the

23  presentence report.  When that report is first published,

24  it's called the preliminary presentence report, correct?

25  A    Correct.

1    Q    Does that report document your findings in terms of the
2    defendant's criminal history, specifically the convictions
3    contained in those documents?
4    A    Yes, it does.
5    Q    And to the best of your recollection were there any
6    objections whatsoever from Mr. Goodwin-Bey at the time of his
7    sentencing to the validity of any of those convictions?
8    A    In reviewing my file this morning, I think there may have
9    been objections but I don't think they were taken up by the
10   Court at the time of sentencing.
11   Q    Would they have been objections -- did he object to the
12   fact that he had sustained those convictions?
13   A    I believe that he may have objected to one conviction.
14   Q    Did he acknowledge both in his plea agreement and during
15   your interview and as a result of this presentence report that
16   he had, in fact, been convicted of the convictions noted in
17   the plea agreement filed in the 2007 case?
18   A    Could you repeat that?
19   Q    With regard to the convictions noted in the plea
20   agreement that Mr. Goodwin-Bey signed, did he acknowledge that
21   he had, in fact, been convicted of that both in the plea
22   agreement and by virtue of the lack of convictions to his
23   presentence report?
24   A    Yes.
25   Q    You met with Mr. Goodwin-Bey personally and you can say

                                   63

1  that Mr. Goodwin-Bey is, in fact, the same Mr. Goodwin-Bey

2  reflected in those documents, correct?

3  A    Correct.

4            MR. KELLEHER:  I have no further questions, Your

5  Honor.

6            THE COURT:  Cross-examination.

7            MR. CANTIN:  I don't have any questions, Your Honor.

8  Thank you.

9            THE COURT:  All right.  May this witness be excused?

10           MR. KELLEHER:  Yes, Your Honor.

11           THE COURT:  You may step down.  Thank you.

12           Any further evidence on behalf of the government

13           MR. KELLEHER:  No, Your Honor.  Government rests.

14           THE COURT:  Any evidence on behalf of the defendant?

15           MR. CANTIN:  No, Your Honor.  I'd move for acquittal

16  at the close of the government's case, at the close of all the

17  evidence.

18           THE COURT:  Do you wish to have any argument on that

19  or just make a motion?

20           MR. CANTIN:  No, sir, just make a motion.

21           THE COURT:  That motion is overruled.

22           Has your client been advised of his right to

23  testify?

24           MR. CANTIN:  He has, Your Honor.

25           THE COURT:  Mr. Goodwin-Bey, do you understand that

64

you have a right to testify if you want to?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You also have a right to remain silent.
If you remain silent, it will be in no way held against you.
You understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you wish to remain silent?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Thank you.  You may be seated, sir.

Anything further we need to take up at this time?

MR. KELLEHER:  No, sir.

MR. CANTIN:  Not from the defense, Your Honor.

THE COURT:  Do you all see any reason for closing
argument?

MR. KELLEHER:  No, Your Honor.  I believe the
evidence speaks for itself.

MR. CANTIN:  No, sir.

THE COURT:  The Court will take the case under
advisement.  I'll review the evidence and I'll be making a
decision in the near future.

Let's talk about exhibits.  I think we've had them
all admitted.  I don't know that I have copies of them.  I
don't know that I need -- what do you guys want to do with the
exhibits?  I don't see any reason for me to have the actual
gun itself or the bullets.

65

```
 1           MR. KELLEHER:  I can make whatever exhibits the
 2   Court needs available, obviously the certified documents.
 3   Everything else I can --
 4           THE COURT:  Make the certified copies available to
 5   me and --
 6           MR. CANTIN:  The video and 911 call may be
 7   informative.
 8           THE COURT:  Yeah, and the video and the 911 call.
 9           MR. KELLEHER:  Pictures?  Anything else?
10           THE COURT:  Maybe of the Town Car.  You all can
11   provide that to my courtroom deputy as you get a chance.
12           Anything else I need to take care of before we
13   adjourn the trial?
14           MR. KELLEHER:  No, Your Honor.
15           MR. CANTIN:  No, sir.
16           THE COURT:  We'll be in adjournment.
17           (Court stands in adjournment at 3:07 p.m.)
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2         I, Jeannine M. Rankin, Federal Official Court Reporter,

 3    in and for the United States District Court for the Western

 4    District of Missouri, Southern Division, do hereby certify

 5    that the foregoing is a true and correct transcript of the

 6    stenographically reported proceedings.

 7

 8

 9

10

11                         /s/ Jeannine M. Rankin

12    Date:      04/17/17      Jeannine M. Rankin, CCR, CSR, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25
```